**Richard A. BOLT and Richard A. Bolt, M.D., Plaintiffs–Appellants,**

**v.**

**HALIFAX HOSPITAL MEDICAL CENTER, et al., Defendants–Appellees.**

Nos. 84–3256, 84–3603.

United States Court of Appeals, Eleventh Circuit.

Jan. 9, 1990.

Donald E. Christopher, Orlando, Fla., Clark Havighurst, Duke University School of Law, Durham, N.C., Hal K. Litchford, Litchford, Christopher & Milbrath, P.C., Orlando, Fla., for plaintiffs-appellants.

Elizabeth R. Hilder, F.T.C., Washington, D.C., for amicus F.T.C.

William E. Loucks, Daytona Beach, Fla., for Volusia County Medical Soc.

James E. Slater, Kimberly Ashby, Orlando, Fla., for Willis Stose, M.D.

J. Charles Ingram, G.B. McVay Voght, Hannah, Marsee, Beik & Voght, Orlando, Fla., for Humana, Boye, Marino and Daytona.

Clinton R. Batterton, David A. Donohoe, Washington, D.C., and Harold C. Hubka, Daytona Beach, Fla., for Halifax Hosp. Medical Center.

Ronald Harrop and Dennis R. O'Connor, Gurney & Handley, P.A., Orlando, Fla., for Smith and Roberson, M.D.'s.

Emmet J. Bondurant and Michael B. Terry, Bondurant, Mixson & Elmore, Atlanta, Ga., for amicus Hosptial Authority of Clarke County.

Janet W. Adams, Adams & Hill, Orlando, Fla., for Ormond Beach Hosp.

Before TJOFLAT, Chief Judge, KRAVITCH, Circuit Judge, and TUTTLE, Senior Circuit Judge.

TJOFLAT, Chief Judge:

We reconsider this case in light of the en banc court's opinion in *Bolt v. Halifax Hosp. Medical Center*, 874 F.2d 755 (11th Cir.1989) (en banc). In that opinion, the en banc court reinstated part of our earlier panel opinion, *Bolt v. Halifax Hosp. Medical Center*, 851 F.2d 1273 (11th Cir.1988). The portion discussing whether the appellees were exempt from federal antitrust liability under the state-action doctrine, *see id.* at 1279–84, remains vacated. For purposes of consolidation, we vacate the remainder of our earlier opinion and adopt the following in its stead:

In this case, a physician whose medical staff privileges were revoked at each of three hospitals brought suit against the hospitals, members of their medical staffs, and a local medical society, alleging violations of federal antitrust laws. The district court entered verdicts for all the defendants, and the physician now appeals. We affirm in part and reverse in part.

I.

In 1979, Dr. Richard A. Bolt arrived in Daytona Beach, Florida, intending to practice surgery there. Upon his arrival, he applied for staff privileges at three area hospitals, Daytona Community Hospital (DCH), Halifax Hospital Medical Center (HHMC), and Ormond Beach Memorial Hospital (OBMH). DCH is a subsidiary of Humana, Inc., which owns and operates several hospitals throughout the United States. HHMC is a special taxing district of the State of Florida, which funds and operates a medical facility also known as Halifax Hospital Medical Center.[1] OBMH

814

is operated as a private, nonprofit organization.

With respect to staff privileges, each hospital's bylaws were essentially the same. Only a physician who had been granted staff privileges could use the hospital's facilities. A physician would receive privileges upon obtaining an "appointment." An appointment lasted for one year; at the end of the year, the physician would be considered for "reappointment" for another one-year term. During the first two appointment terms, the physician would be a probationary member of the medical staff. After two years, he or she could apply for elevation to active staff membership. When the physician applied for elevation, three outcomes were possible: reappointment and elevation, reappointment for another year without elevation (in which case the physician could apply again for elevation the following year), or denial of reappointment.

The bylaws delineated a specific process for decisions affecting staff privileges, including decisions concerning reappointment and elevation to active staff membership. First, a credentials committee, composed of active staff members, would make a recommendation based on the physician's medical charts and other pertinent information. That recommendation would be taken up by an executive committee, also composed of active staff members. The executive committee would conduct a more extensive investigation and then reach a decision. If the decision was adverse to the physician under consideration, the physician could appeal to a judicial review committee, which had discretion to conduct its own investigation; like the credentials and executive committees, the judicial review committee would be composed of active staff members. The recommendations that emerged from the various committees would in every case ultimately be considered by the hospital's governing board, which was responsible for reaching the final decision.

In the fall of 1979, DCH, HHMC, and OBMH each granted Dr. Bolt an initial appointment. Dr. Bolt understood that, pursuant to the bylaws of each hospital, he would remain on probationary status until the fall of 1981, at which time he would be considered for elevation to active staff membership. In the fall of 1979, Dr. Bolt also applied for and was granted provisional membership in the Volusia County Medical Society (VCMS), a local professional organization for physicians.

On September 10, 1981, the DCH credentials committee met to consider whether Dr. Bolt should be reappointed and elevated to active staff membership. In its report to the executive committee, the credentials committee noted that it had received complaints about Dr. Bolt's hostile, disruptive, and antagonistic behavior from DCH's nursing staff, patients, physicians, and administration. After considering the multiple difficulties Dr. Bolt had encountered both in DCH and in other hospitals within the community, the credentials committee voted to recommend conditioning Dr. Bolt's reappointment on his agreement to seek psychiatric counseling through the Impaired Physicians Program operated by the Florida Medical Association. On September 22, the executive committee adopted the credentials committee's recommendation and notified Dr. Bolt that his name has been forwarded to the Impaired Physicians Program. Dr. Bolt immediately responded that he would not participate in the program, and the executive committee thereafter voted to deny reappointment.[2]

The day after the DCH executive committee notified Dr. Bolt of its decision to forward his name to the Impaired Physicians Program, the OBMH credentials committee met and voted to recommend that Dr. Bolt be denied reappointment. The OBMH executive committee sustained the credentials committee's recommendation on

2. Apparently, Dr. Bolt's existing appointment had not yet expired, and he therefore continued to admit patients to DCH for some time after the executive committee's decision. The executive committee subsequently voted to suspend Dr. Bolt's privileges for the remainder of his initial appointment term.

October 27.[3]

Meanwhile, sometime in September,[4] the HHMC credentials committee met and voted to recommend that Dr. Bolt be denied reappointment. The executive committee subsequently voted to sustain the recommendation and notified Dr. Bolt of its decision on October 13.[5]

Thus, during the months of September and October 1981, the executive committees at all three hospitals took action against Dr. Bolt. Over the following several months, Dr. Bolt prosecuted appeals at all three hospitals. At HHMC, the judicial review committee found no reason to disagree with the executive committee's decision, and the board of trustees subsequent-

ly voted to ratify that decision. At DCH, the judicial review committee did disagree with the executive committee's decision; in fact, it voted to reappoint Dr. Bolt unconditionally. The board of trustees rejected the judicial review committee's decision, however, and ratified the executive committee's decision. Finally, at OBMH, the proceedings before the judicial review committee were still pending at the time Dr. Bolt instituted this suit, and Dr. Bolt has not pursued those proceedings to their conclusion.

In March 1982, Dr. Bolt filed a complaint in the district court containing federal antitrust claims, federal constitutional claims, federal contract claims, and a variety of pendent state law claims. Named as defen-

**3.** At the time of the decision, Dr. Bolt's existing appointment at OBMH had not yet expired. In addition to denying reappointment, the executive committee summarily suspended Dr. Bolt's privileges for the remainder of his initial appointment term.

**4.** The record does not reveal the precise date.

**5.** A letter to Dr. Bolt, dated October 13, 1981, summarized the basis for the HHMC executive committee's action:

The above action was deemed necessary because you failed to satisfactorily complete your probationary period which began in September 1979, and adverse letters of recommendation were received from the President of the Medical Staff, the Chairman of the Department of Surgery, and the Chief of the Subsection of General Surgery, based on the unanimous opinion of the members of that Subsection.

Specifically, since your probationary period began in September 1979, you have consistently evinced behavior that has been:

1. Hostile, disruptive and antagonistic to other health professionals, to wit:

Incident on IMC, February 28, 1981; incident on 3–Central, February 22, 1981; incident on ISC, July 1980.

Incident involving case review on Mr. Clayton Black, brought up ten months after his death, July 22, 1981.

Incident at Daytona Community Hospital Operating Room, where you insulted and degraded another doctor in the presence of nurses, August 1981.

2. Unethical:

You have not dealt honestly and forthrightly with patients and colleagues, in violation of Paragraph 2 of the Preamble of the American Medical Association *Principles of*

*Medical Ethics.* Specifically, in your letter of June 15, 1981, to Alvin E. Smith, M.D., you falsely charged four physicians with providing inadequate coverage to patient Betty Jones. You attempted to solicit this patient to make written complaints against her doctors, and attempted to undermine this patient's confidence in her doctors.

3. Unprofessional:

You called the family of Maribelle Wynn, deceased patient, and told them that she need not have died and advised them that they had legal recourse in a subsequent call. This occurred shortly after her demise and resulted in unnecessary pain, suffering and doubt for her loved ones, thus perverting the traditional role of physician in our society.

You passed retention sutures through an abdominal wound in Patient Schmidt at Daytona Community Hospital in March 1981, without benefit of anesthesia, either local or general, causing this patient unnecessary pain and suffering and provoking a disturbance and incredulity in family members aware of their loved one's needless discomfiture. This behavior is not only unprofessional, but is adverse to good patient care *a priori.*

There are many other incidents which could be cited to demonstrate the disturbing pattern of behavior which has resulted in this proceeding. The above are cited with some specificity so that you will have the opportunity to respond to them.

The Executive committee contends that this behavior, as illustrated by the above incidents, is well below the standards and goals of the Medical Staff of Halifax Hospital Medical Center, is adverse to good patient care, and is inimical to the Hospital and the Medical Staff.

dants were DCH,[6] HHMC, OBMH, the Volusia County Medical Society (VCMS), and five physicians: Drs. Richard Boye, Ralph Marino, Alvin Smith, Shedrick Roberson, and Willis Stose.[7] Each of the individual defendants had played some official role in the privileges decision at one of the hospitals. Dr. Boye, chief of staff at DCH, had served on DCH's credentials and executive committees; he had also served on DCH's board of trustees. Dr. Marino, chief of surgery at DCH, had served on DCH's credentials and executive committees. Dr. Smith, chief of staff at HHMC, had served on HHMC's credentials and executive committees. Dr. Roberson, chief of surgery at HHMC, had served on HHMC's executive committee. Finally, Dr. Stose, chief of surgery at OBMH, had served on OBMH's credentials and executive committees.

This appeal concerns only Dr. Bolt's federal antitrust claims; we relegate our discussion of his other claims to the margin.[8] As to the antitrust claims, Dr. Bolt alleged that the defendants had conspired, along with unnamed co-conspirators, to restrain competition in violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (1988).[9] Specifically, Dr. Bolt alleged the existence of three separate conspiracies: one involving DCH and the members of its medical staff who took part in the DCH peer review decision to revoke his privileges, one involving HHMC and the members of its medical staff who took part in the peer review decision there, and one involving DCH,

---

**6.** Also named as a defendant was Humana, Inc., DCH's parent corporation. When we refer to DCH in its capacity as a defendant, we mean both DCH and Humana, Inc.

**7.** Also named as defendants were Drs. C.R. DeArmas, Jr. and Thurman Gillespy, Jr. The district court dismissed Drs. DeArmas and Gillespy before trial, and Dr. Bolt does not challenge that ruling in this appeal.

**8.** The federal antitrust claims were contained in count I of the complaint. Count II contained claims under 42 U.S.C. § 1983 (1982). Citing several defects in the procedures the defendants used in reaching their decisions to revoke his staff privileges, Dr. Bolt alleged in count II that the defendants had deprived him of his fourteenth amendment rights to due process and equal protection of the laws.

Count III was styled "federal contractual claims." In that count, Dr. Bolt alleged that the three hospitals, as participants in the federal Medicare program, had a contractual obligation to the United States government to comply with certain federal regulations pertaining to peer review procedures. Dr. Bolt alleged that the three hospitals had failed to comply with these regulations and had therefore breached their contractual obligation to the United States government, and that he, as a third-party beneficiary, had suffered an actionable harm.

Counts IV through X contained a variety of state law claims. In count IV, Dr. Bolt alleged that when he was first granted probationary privileges by the three hospitals, each hospital implicitly promised that his privileges would be terminated according to the procedures set out in the hospital's bylaws. Each hospital, Dr. Bolt alleged, had breached that promise, and Dr. Bolt requested the court to enter an injunction requiring the hospitals to reinstate his privileges. Count V contained claims for interfer-

ence with prospective economic advantage. Count VI contained claims under Florida antitrust laws. Count VII contained claims for intentional infliction of emotional distress. Count VIII contained a claim for slander, and counts IX and X each contained a separate claim for libel.

The defendants moved the district court, pursuant to Fed.R.Civ.P. 56, to enter summary judgment on all counts. The court denied summary judgment on the federal antitrust claims and the state law claims. It granted summary judgment on the section 1983 claims, but only insofar as those claims pertained to DCH, VCMS, Drs. Boye, Marino, and Stose. With respect to those defendants, the court held that the requisite state action was missing. As for the section 1983 claims against the remaining defendants—HHMC, Dr. Smith, and Dr. Roberson—the court indicated that it would defer ruling on the motion for summary judgment and would sever the claims so that the parties could proceed to trial on the federal antitrust and state law claims.

The parties thus proceeded to trial. As explained in the text, the district court ordered Dr. Bolt to present his evidence of conspiracy first. After he had done so, the defendants moved the district court for directed verdicts on the federal antitrust claims, and the court granted the motions. The court thereafter granted the pending motions by HHMC, Dr. Smith, and Dr. Roberson for summary judgment on the section 1983 claims. Having thus disposed of all the federal claims, the court dismissed the state law claims without prejudice.

**9.** Dr. Bolt also alleged that the defendants had conspired to engage in a monopoly in violation of 15 U.S.C. § 2 (1988). Our discussion of the conspiracy element of Dr. Bolt's section 1 claims also applies to the conspiracy element of his section 2 claims.

HHMC, OBMH,[10] the members of their staffs who took part in their peer review decisions, and VCMS.

Before trial, the district court convened a hearing to resolve several pending motions. One of these was a motion by the defendants concerning the order of proof at trial. Noting that a claim under section 1 of the Sherman Act requires proof of (1) a contract, combination, or conspiracy in violation of the antitrust laws, and (2) a restraint on competition,[11] the defendants requested that the district court require Dr. Bolt to present his evidence regarding the contract, combination, or conspiracy element first. The defendants urged that this course would be an efficient one; if Dr. Bolt's evidence of concerted action proved insufficient to go to the jury, the district court could enter directed verdicts for the defendants at the close of that evidence, thus saving Dr. Bolt from presenting unnecessarily his evidence of restraint on competition. The district court agreed that this would be an efficient way to proceed and accordingly ruled that Dr. Bolt would be required to present his evidence of concerted action first.

The defendants also moved the district court to rule prior to trial that any evidence attacking the merits of the staff privileges decisions at the three hospitals would be inadmissible. Dr. Bolt proposed to show that certain members of the peer review committees knowingly suborned false and fabricated evidence against him. He proposed, moreover, to establish that these members had personal motives for subverting the peer review proceedings. Finally, he proffered that, through the testimony of Dr. Edward R. Woodward, Chairman of the Department of Surgery at the University of Florida Medical School, he would prove

that at least some of the alleged grounds supporting the hospitals' actions against him were pretextual. Specifically, Dr. Bolt wished to attack those grounds that pertained to specific medical cases in which he had been involved; he informed the court that Dr. Woodward had reviewed the medical files for those cases and was prepared to testify that no legitimate basis existed for the charges leveled against Dr. Bolt. The district court rejected Dr. Bolt's proffers, ruling that Dr. Bolt was precluded, as a matter of law, from attacking any of the grounds upon which the hospitals had relied in revoking his medical staff privileges.

The case proceeded to trial before a jury. Dr. Bolt put on his evidence of conspiracy first, as required by the district court's pretrial ruling. At the close of this evidence, the defendants moved the court to enter directed verdicts pursuant to Fed.R. Civ.P. 50(a). The court granted the motions, ruling, in a memorandum order, that Dr. Bolt had failed to adduce evidence of an unlawful contract, combination, or conspiracy, within the meaning of section 1 of the Sherman Act, sufficient to take the case to the jury. Dr. Bolt now appeals.

As we state above, this is our second panel opinion in this case. In our first effort, we held that the appellee hospitals and their medical staffs were exempt from federal antitrust liability under the state-action doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). *See Bolt v. Halifax Hosp. Medical Center*, 851 F.2d 1273, 1284 (11th Cir.1988). We reached this holding after concluding that Florida's regulatory scheme provides for judicial review of medical peer review board decisions that is sufficiently probing to constitute "active state supervision" un-

---

**10.** Although the complaint alleges a conspiracy involving HHMC and members of its medical staff, and another conspiracy involving DCH and members of its medical staff, the complaint does not allege another separate conspiracy involving OBMH and members of its medical staff. This may be because the OBMH governing board had not taken final action against Dr. Bolt at the time he instituted this lawsuit. In any event, the complaint alleges that the OBMH defendants—OBMH and Dr. Stose—took part only in the larger conspiracy involving all three

hospitals, members of their medical staffs, and VCMS.

**11.** Section 1 provides as follows:
Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal....
15 U.S.C. § 1 (1988).

der *Parker*, as recently interpreted by the Supreme Court in *Patrick v. Burget*, 486 U.S. 94, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988). *See Bolt*, 851 F.2d at 1281–84. Our earlier decision was vacated, however, when the case was taken en banc. *See Bolt v. Halifax Hosp. Medical Center*, 861 F.2d 1233, 1234 (11th Cir.1988). At oral argument before the en banc court, the appellee hospitals and their medical staffs formally withdrew any claim that they were immune from antitrust liability under *Parker*'s state-action doctrine.[12] The en banc court accordingly refrained from deciding the immunity issue and remanded the case to the panel with the instruction that we "reconsider [our] decision in light of the hospitals' and medical staffs' waiver of [state-action] immunity." *See Bolt v. Halifax Hosp. Medical Center*, 874 F.2d 755, 756 (11th Cir.1989) (en banc).

## II.

In this appeal, we are concerned only with the contract, combination, or conspiracy element of Dr. Bolt's section 1 claims; as explained above, the district court based the directed verdicts solely on the perceived deficiency of Dr. Bolt's evidence on that issue. Due to the ordering of proof mandated by the district court, Dr. Bolt had no opportunity to present evidence on the restraint of competition element. Our focus on appeal is therefore a narrow one: with respect to the contract, combination, or conspiracy element of Dr. Bolt's section 1 claims, was the evidence—that which was admitted *and that which should have been admitted*—sufficient to take the case to the jury?

As we have already noted, Dr. Bolt alleged the existence of three separate conspiracies: (1) a conspiracy involving DCH and members of its medical staff, (2) a conspiracy involving HHMC and members of its medical staff, and (3) a conspiracy involving DCH, HHMC, OBMH, members

of their medical staffs, and VCMS. For the sake of convenience, we will refer to these alleged conspiracies as the DCH conspiracy, the HHMC conspiracy, and the community-wide conspiracy. In its memorandum order, the district court discussed only the community-wide conspiracy. Since the court entered directed verdicts in favor of all defendants on all of Dr. Bolt's antitrust claims, however, we must assume that the court found the evidence wanting with respect to each of the conspiracies alleged in the complaint. Our task in this appeal, then, is to determine if the evidence regarding any of the three alleged conspiracies was sufficient to allow the case to go to the jury on the contract, combination, or conspiracy issue. We discuss each conspiracy in turn, beginning with the DCH conspiracy.

### A.

The alleged co-conspirators in the DCH conspiracy were DCH and the members of its medical staff who took part in the DCH peer review decision to revoke Dr. Bolt's privileges.[13] These defendants urge us to uphold the district court's directed verdicts on two grounds. First, they argue that DCH and its medical staff were legally one entity and therefore incapable of concerted action within the meaning of section 1 of the Sherman Act. Second, they argue that the directed verdicts were proper because no evidence supported a finding of a contract, combination, or conspiracy. We discuss these arguments in order.

### 1.

To establish a violation of section 1 of the Sherman Act, a plaintiff must prove that two or more distinct entities agreed to take action against him. The directed verdicts in this case would therefore have been proper if, as the defendants contend, the DCH defendants were legally

---

**12.** As we discuss *infra*, HHMC individually presented a new and slightly modified state-action argument in its brief on rehearing en banc.

**13.** Of the DCH staff members who participated in the peer review decision, two are named as

defendants in this case: Drs. Boye and Marino. In this opinion, we sometimes refer to these defendants and DCH collectively as "the DCH defendants."

incapable of concerted action within the meaning of section 1 of the Sherman Act. We perceive no basis, however, for holding that the members of a medical staff are legally incapable of conspiring with one another. Each member practices medicine in his individual capacity; each is a separate economic entity potentially in competition with other physicians. *See Cooper v. Forsyth County Hosp. Auth.*, 789 F.2d 278, 282 (4th Cir.) (Motz, J., concurring), *cert. denied,* 479 U.S. 972, 107 S.Ct. 474, 93 L.Ed.2d 418 (1986); *Weiss v. York Hosp.*, 745 F.2d 786, 816 (3d Cir.1984), *cert. denied,* 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985).

Additionally, we perceive no basis for holding that a hospital is legally incapable of conspiring with the members of its medical staff. Relying on the rule that a corporation cannot conspire with its officers and directors, *see, e.g., Harvey v. Fearless Farris Wholesale, Inc.*, 589 F.2d 451, 455 & n. 7 (9th Cir.1979), some courts have held that a hospital cannot conspire with its medical staff for purposes of section 1 liability. *See, e.g., Weiss*, 745 F.2d at 817; *Buckner v. Lower Florida Keys Hosp. Dist.*, 403 So.2d 1025, 1029 (Fla.Dist.Ct.App.1981). We find this analogy faulty, however. The rule for corporations is based on considerations unique to the corporate context. Theoretically, a "conspiracy" involving a corporation and one of its agents would occur every time an agent performed some act in the course of his agency, for such an act would be deemed an act of the corporation. Thus, the rule that a corporation is incapable of conspiring with its agents is necessary to prevent erosion of the principle that section 1 does not reach unilateral acts. A hospital and the members of its medical staff, in contrast, are legally separate entities, and consequently no similar danger exists that what is in fact unilateral activity will be bootstrapped into a "conspiracy." *See Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440, 1450 (9th Cir.1988). In sum, then, we hold that a hospital and the members of its medical staff are all legally capable of conspiring with one another. *See generally* Blumstein & Sloan, "Antitrust and Hospital Peer Review," Law &

Contemp. Probs., Spring 1988, at 7, 52–53 (finding this holding in panel's earlier opinion to be "sound").

### 2.

That the members of the committees could conspire with each other and with their hospital does not mean, however, that every action taken by the committees and hospital satisfies the contract, combination, or conspiracy requirement of section 1 of the Sherman Act. To satisfy that requirement, Dr. Bolt must also prove that the members actually did conspire.

■ To carry the burden of proof on this issue under section 1, a plaintiff may rely on either direct or circumstantial evidence. *American Tobacco Co. v. United States,* 328 U.S. 781, 809–10, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). If the plaintiff provides direct evidence of conspiracy, the case becomes an easy one. Few cases, however, are that easy. Dr. Bolt, like most section 1 plaintiffs, has relied on circumstantial evidence—evidence of irrational conduct that would create an inference of conspiracy.

■ When relying on circumstantial evidence to prove the existence of a conspiracy, a plaintiff first must show a nonlegitimate motive for entering into such a conspiracy. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596–97, 106 S.Ct. 1348, 1361, 89 L.Ed.2d 538 (1986). In other words, "the plaintiff must show that the conspiracy alleged is an economically reasonable one"—i.e., one that would inure to the defendants' economic benefit. *Winn v. Edna Hibel Corp.*, 858 F.2d 1517, 1519 (11th Cir.1988). Second, a plaintiff must adduce evidence that tends to exclude the possibility that the alleged co-conspirators acted independently and in a manner consistent with rational business objectives. *Monsanto Co. v. Spray–Rite Serv. Co.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984); *Winn*, 858 F.2d at 1519–20.

■ A section 1 plaintiff, however, need not prove an intent on the part of the

co-conspirators "to restrain trade or to build a monopoly." *United States v. Griffith*, 334 U.S. 100, 105, 68 S.Ct. 941, 944, 92 L.Ed. 1236 (1948). So long as the purported conspiracy has an anticompetitive effect, the plaintiff has made out a case under section 1. *See NCAA v. Board of Regents*, 468 U.S. 85, 101 n. 23, 104 S.Ct. 2948, 2960 n. 23, 82 L.Ed.2d 70 (1984); *United States v. Patten*, 226 U.S. 525, 543, 33 S.Ct. 141, 145, 57 L.Ed. 333 (1913); *Hahn v. Oregon Physicians' Serv.*, 868 F.2d 1022, 1026 (9th Cir.1988), *cert. denied*, —— U.S. ——, 110 S.Ct. 140, 107 L.Ed.2d 99 (1989). Therefore, in determining whether a conspiracy exists, if a motive for the conspiracy is evident, then the court must decide whether the plaintiff has adduced evidence that reasonably tends to prove a "conscious commitment" on the part of the alleged co-conspirators to enter into a scheme "designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471. In other words, the evidence must tend to prove (1) an intent to adhere to an agreement (2) designed to achieve an unlawful objective; but the evidence need not show that the co-conspirators specifically intended to restrain trade or to monopolize. We now apply this test to the purported DCH conspiracy.

■ The alleged DCH co-conspirators argue that they had no rational economic motive for conspiring to deny Dr. Bolt's hospital privileges. We disagree. One of the first principles of economics is the inverse relationship of supply to price. If doctors in a hospital can exclude other doctors from practicing in that hospital, then obviously the remaining doctors can charge a higher price for their services. *See* Blumstein & Sloan, *supra* at 9, 15. Furthermore, as the defendants' own arguments suggest, a negative decision at one hospital could affect the decision at another hospital; therefore, as two commentators have noted, a negative decision by one hos-

pital could be "tantamount to excluding a doctor from the profession as a whole." *See id.* at 15. Given the ability of a single peer review committee to control the supply of doctors not only at one hospital but also in the profession as a whole, we conclude that there existed a rational economic motive for the DCH defendants to conspire to deny Dr. Bolt's hospital privileges.

■ We now address the second prong of the contract, combination, or conspiracy test: whether Dr. Bolt presented, *or could have presented*, evidence that tended to exclude the possibility that the alleged co-conspirators acted legitimately and independently. As we note above, our inquiry must focus on two questions: does the evidence tend to prove (1) that the co-conspirators intended to enter into an agreement, and (2) that the agreement was designed to achieve an unlawful objective. Again, we note that the evidence need not prove that the agreement was designed to monopolize or restrain trade but only that it (1) was not designed to achieve a legitimate business purpose and (2) had an anticompetitive effect. *See supra* at 820.

Because the district court refused to admit certain evidence that might have shown the existence of an agreement designed to achieve an unlawful objective, we need not review the district court's decision to grant a directed verdict only in light of the evidence actually admitted.[14] Instead, we should determine whether the proffered evidence was admissible and, if it was, whether the evidence as a whole was such that "there can be but one conclusion as to the verdict that reasonable men could have reached." *Rabun v. Kimberly–Clark Corp.*, 678 F.2d 1053, 1057 (11th Cir.1982). We think the proffered evidence was clearly admissible and that, in light of that evidence plus the admitted evidence,[15] reasonable men could disagree with the district court's conclusion that no contract, combination, or conspiracy existed.

---

**14.** We review some of the relevant evidence *infra* at pp. 826–28.

**15.** *See infra* at pp. 826–28.

As already noted, Dr. Bolt proposed to show that certain members of the DCH peer review committees knowingly suborned false evidence against him and that these individuals had personal motives for subverting the peer review proceedings. He also proposed to use Dr. Woodward's testimony to attack as pretextual some of the grounds of the DCH defendants' decisions. Dr. Bolt indicated in his proffer to the district court that Dr. Woodward's testimony would show that the DCH defendants based their decision in part on two incidents that called Dr. Bolt's medical or professional judgment into question. Dr. Bolt proposed to show that the medical staff at DCH investigated the incidents, and, based on the findings from that investigation, DCH decided to revoke his privileges. Dr. Woodward was prepared to testify that he had reviewed the facts underlying the DCH investigations and had concluded that no reasonable medical practitioner would have reached the same conclusions as those reached by the DCH investigators.[16]

The defendants objected to the proffered evidence on two grounds. First, they objected on relevancy grounds, arguing that the proffered evidence failed, as a matter of law, to raise an inference of conspiracy.

Second, they objected that even if it were relevant, it should be excluded because it would unnecessarily confuse the jurors by forcing them to consider complicated facts that had no direct relationship to the subject matter of the antitrust litigation. The district court apparently found both these arguments persuasive.

We conclude that the district court erred to the extent that its exclusion of the Woodward testimony was based on relevancy grounds. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Clearly, Dr. Bolt's proffered evidence was relevant. If the evidence showed that the DCH investigation's conclusions were so baseless that no reasonable medical practitioner, considering the same set of facts, could have reached those conclusions, then a factfinder could easily infer from that evidence that the hospital and its peer review committees intended to enter into an agreement designed to achieve an end not dictated by legitimate business concerns. And, of course, such an agreement would have an anticompetitive effect by excluding

**16.** The first of these incidents involved a patient at DCH named Maribelle Winn. Mrs. Winn died at DCH while under the care of Dr. Smith, Dr. Bolt, and Dr. Smith's medical partner, Dr. Ruben. Soon after Mrs. Winn's death, Dr. Bolt telephoned her surviving daughters and told them that their mother would not have died but for the negligent care she received from Drs. Smith and Ruben. This action by Dr. Bolt apparently enraged Dr. Smith; in his deposition, Dr. Smith remarked that he could have "pinned [Dr. Bolt's] ass to the front door with [his] fist." Some time later, Dr. Schildecker, a pathologist at DCH and a member of the DCH executive committee, conducted an investigation of the Winn death. Dr. Schildecker's conclusion was that Drs. Smith and Ruben had engaged in no wrongdoing. Dr. Bolt, therefore, had apparently acted maliciously and unprofessionally when he called the Winn daughters and told them that their mother had died because of negligent treatment. Dr. Bolt's behavior in connection with the Winn case was apparently used by the executive committee at each hospital (including the executive committee at HHMC, where Dr. Smith was chief of staff) as a ground for revoking his privileges. See infra note 30.

Based on his review of the Winn medical file, however, Dr. Woodward was prepared to testify that Mrs. Winn's treatment was in fact so grossly inadequate that it amounted to negligent homicide. From this testimony, a factfinder could conclude that the charge leveled against Dr. Bolt in connection with the Winn matter—that he had acted maliciously and unprofessionally when he telephoned the Winn daughters—was without foundation.

The second incident involved another DCH patient, Harold Schmidt. Some time after undergoing abdominal surgery, Mr. Schmidt's surgical incision burst open. Alerted to the problem, Dr. Bolt went directly to Mr. Schmidt's room and proceeded to pass retention sutures through the wound, without first giving Mr. Schmidt any anesthesia. The Schmidt incident, like the Winn incident, was apparently used by all three executive committees as a ground for revoking Dr. Bolt's privileges. See infra note 30. Dr. Woodward was again prepared to testify, based on his review of the Schmidt medical file, that Dr. Bolt's actions were entirely proper in light of the patient's condition.

822

Dr. Bolt from competition with other doctors at the hospital.[17]

We recognize that the district court might have excluded Woodward's testimony on the alternative ground that the testimony would unnecessarily confuse the jurors. Under Fed.R.Evid. 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of ... confusion of the issues[ ] or misleading the jury." We have noted that "[e]xclusion of relevant evidence pursuant to Rule 403 is an extraordinary remedy to be used sparingly." *United States v. Plotke*, 725 F.2d 1303, 1308 (11th Cir.1984). A trial court's ruling pursuant to Rule 403, however, will not be disturbed absent an abuse of discretion. *See Hendrix v. Raybestos–Manhattan, Inc.*, 776 F.2d 1492, 1501 (11th Cir.1985). Assuming that the district court based its ruling on Rule 403, we find such an abuse here.

The district court misunderstood the legal import of the proffered evidence: in its view, the evidence had no probative value as a matter of law. Although the district court expressly limited its initial inquiry to the contract, combination, and conspiracy requirement, it seemed more concerned with whether the proffered evidence was relevant to the reasonableness of the agreement's anticompetitive effect. The district court noted that proof of a jealous intent on the defendants' part was not relevant because "[u]nder the Rule of Reason only agreements which are unreasonably restrictive of competition violate Section 1 of the Sherman Act." Whether or not the rule of reason applies to this case and

whether or not the proffered evidence is relevant to a rule-of-reason analysis are simply not yet at issue. By virtue of the district court's own express limitation, we are concerned only with whether the evidence could tend to support a finding of contract, combination, or conspiracy.

Laboring under its misapprehension of the law, the district court obviously could not have made a sound judgment that the probative value of the evidence was substantially outweighed by the danger of confusing the jury. Because Dr. Bolt's proffered evidence might have provided the only basis upon which the trier of fact could have found a contract, combination, or conspiracy, the probative value of that evidence was extremely high. *See United States v. Russo*, 717 F.2d 545, 551–52 (11th Cir.1983) (when evidence essential to prove element of offense, probative value very high). We therefore have a "definite and firm conviction" that the district court erred in excluding the proffered evidence and thus abused its discretion. *See Balogh's of Coral Gables, Inc. v. Getz*, 798 F.2d 1356, 1358 (11th Cir.1986) (en banc).[18]

In sum, we conclude that the district court erred in prohibiting Dr. Bolt from introducing evidence that the peer review proceedings were a sham and that the DCH defendants' reasons for revoking his staff privileges were pretexts. When reviewing a district court's grant of a directed verdict or judgment n.o.v., we must view the evidence in the light most favorable to the party against whom the motion for directed verdict or judgment n.o.v. is made. *Hughes v. Equitable Life Assurance Soc'y,*

17. Whether that anticompetitive effect was unreasonable is a determination expressly reserved by the district court and thus is not before us now.

18. We note that the district court apparently believed that Dr. Bolt was precluded, as a matter of law, from attacking the factual basis of the DCH defendants' decision because such an attack would constitute a form of forbidden "de novo review." We are frankly unable to identify the legal basis for this particular conclusion. In its memorandum opinion, the court cited *Sosa v. Board of Managers*, 437 F.2d 173 (5th Cir.1971), as support. *Sosa* involved a physi-

cian who sued the board of a state hospital, claiming that the board had violated the due process and equal protection clauses of the fourteenth amendment in denying his application for staff privileges. Reduced to its essentials, the case involved two issues: whether the criteria the board used to judge the plaintiff's application were arbitrary and capricious, and whether the plaintiff had been afforded procedural due process, i.e., notice and a hearing. *See id.* at 176–77. In the present case, however, Dr. Bolt attacks neither the hospitals' procedures nor the substance of the criteria they purported to apply. *Sosa* is plainly inapposite.

465 F.2d 743, 744 (5th Cir.1972).[19] Viewing the proffered and admitted evidence in the light most favorable to Dr. Bolt, we think that it clearly tends to prove the existence of a contract, combination, or conspiracy. We therefore conclude that the district court erred in granting directed verdicts in favor of the DCH defendants.

## B.

The HHMC conspiracy is of the same nature as the DCH conspiracy. The alleged co-conspirators are HHMC and the members of its staff who participated in the HHMC peer review decision to revoke Dr. Bolt's privileges.[20] Because there was evidence that the HHMC executive committee's decision to revoke Dr. Bolt's privileges was based, in part, on his alleged misconduct at DCH,[21] our analysis of the DCH conspiracy applies to the HHMC conspiracy as well. The court's error in prohibiting Dr. Bolt from attacking the factual basis of the DCH defendants' decision also infected the directed verdict in favor of the HHMC defendants.

19. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

20. Of the HHMC staff members who participated in the peer review decision, two are named as defendants in this case: Drs. Smith and Roberson. In this opinion, we sometimes refer to these defendants and HHMC collectively as "the HHMC defendants."

21. *See supra* note 5.

22. This argument should be distinguished from the state-action argument abandoned by all of the defendants at oral argument before the en banc court. This panel had previously concluded that, as *private parties,* the DCH and HHMC defendants were protected by *Parker* because peer review decisions in Florida were sanctioned by a clearly articulated state policy and were actively supervised by Florida state courts. *Bolt v. Halifax Hosp. Medical Center,* 851 F.2d 1273, 1281–84 (11th Cir.1988). Having abandoned its *Parker* defense as a private party, HHMC now argues that it is entitled to *Parker* protection simply because it is a state agency. We agree with HHMC that when a state agency's actions are at issue, we need not address the

HHMC presents two additional arguments of its own. First, it argues that it was a state agency acting as sovereign and thus, under *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), not subject to antitrust scrutiny.[22] Alternatively, HHMC argues that, even if it is not a state agency, it acted pursuant to state authorization and thus, under *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985), avoided the reach of the antitrust laws. We address each argument in turn.

### 1.

In *Parker,* the Supreme Court held that when a state agency "made no contract or agreement and entered into no conspiracy in restraint of trade or to establish monopoly but, as sovereign, imposed the restraint as an act of government," the agency is not subject to scrutiny under section 1. 317 U.S. at 352, 63 S.Ct. at 314. We need not explore this aspect of HHMC's *Parker* argument in great detail: HHMC simply is not a state agency acting as sovereign.[23]

questions of active supervision and clear articulation, *see Hoover v. Ronwin,* 466 U.S. 558, 574, 104 S.Ct. 1989, 1998, 80 L.Ed.2d 590 (1984) (when state acting through courts or legislature, "only requirement is that the action be that of 'the State acting as a sovereign'"). We therefore address HHMC's new state-action argument.

23. Even if HHMC is a state agency, *Parker* appears to be inapplicable to this case. The Supreme Court expressly noted that, in the case before it, the state agency "made no contract or agreement and entered into no conspiracy." 317 U.S. at 352, 63 S.Ct. at 314. Thus, the Court addressed only those situations in which the state agency acted unilaterally, as sovereign, in *imposing* the restraint. In *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Court held that when a state agency joins in a private anticompetitive agreement not required by the state, the agency loses its protected status under *Parker. Id.* at 790–92, 95 S.Ct. at 2015; *see also* Comment, The State Action Exemption in Antitrust: From *Parker v. Brown* to *Cantor v. Detroit Edison Co.,* 1977 Duke L.J. 871, 893–95. Dr. Bolt, in the present case, does not allege that HHMC acted pursuant to state requirements, but rather, that it acted in concert with other private individuals. Such conduct on the part of a state agency would remove it from the protection of *Parker.*

In *Hoover v. Ronwin*, 466 U.S. 558, 568–69, 104 S.Ct. 1989, 1995, 80 L.Ed.2d 590 (1984), the Supreme Court held that when a state acts through its legislature or supreme court [24] its actions are protected by *Parker* without the showing of clear articulation and active supervision normally required of nonsovereign parties.[25] The Court went on to hold that, in certain circumstances, a subordinate state agency can claim this special status when acting pursuant to authority delegated by the legislature or supreme court. *Id.*, 104 S.Ct. at 1995. The Court emphasized, however, that an agency may claim this status only if, in discharging its delegated responsibilities, it is closely supervised and controlled by the sovereign—the legislature or supreme court. *Id.* In holding that the actions of Arizona's Committee on Examinations and Admissions constituted the actions of the Arizona Supreme Court, the Court based its decision on the conclusion that the Arizona Supreme Court "itself approved the particular grading formula and retained the sole authority to determine who should be admitted to the practice of law in Arizona." *Id.* at 573, 104 S.Ct. at 1998.

█ In light of the Court's holding in *Hoover*, we conclude that HHMC's denial of Dr. Bolt's hospital privileges cannot be attributed to the Florida Supreme Court, legislature, or governor. HHMC is a special tax district created by the Florida legislature to serve Volusia County, Florida. 1979 Fla.Laws ch. 79–577, § 1. The legislature created a board of commissioners for the district, to be selected by the governor, *id.* § 2, and conferred upon the board the power to employ such "agents and employees as may be advisable," *id.* § 3. The enabling legislation requires annual disclosure of the district's financial condition, *id.*

§ 13, and annual auditing of the district by an independent auditor, with discretionary auditing by the governor through Florida's Auditor General, *id.* § 18. The legislation, however, provides the legislature, supreme court, and governor with no authority to supervise directly the board's personnel decisions, imposing upon the board a general duty to act in a manner consistent with the "public good," *id.* § 5.

While the board's decision not to extend hospital privileges to a physician may be reviewed in Florida state courts in the context of a lawsuit, *see North Broward Hosp. Dist. v. Mizell*, 148 So.2d 1, 4 (Fla. 1962), we find nothing to suggest that the Florida Supreme Court, legislature, or governor has the degree of supervision necessary under *Hoover* to imply that acts of the board constitute acts of the sovereign. *See Cine 42nd Street Theater Corp. v. Nederlander Org.*, 790 F.2d 1032, 1036, 1044 (2d Cir.1986) (agency's leasing power limited only by requirement that proposed project be found likely to improve a decayed area; actions taken pursuant to leasing power not considered sovereign's actions). HHMC cannot claim that, in denying Dr. Bolt's hospital privileges, it is entitled to the special status of state sovereign under *Parker* and *Hoover*.

### 2.

█ HHMC argues that, even if it is not a state agency, it is the equivalent of a municipality and therefore exempt from the antitrust laws under *Town of Hallie*.[26] Having determined that HHMC is not a state agency, we now address this argument.

The powers granted to HHMC by its enabling legislation are in many important aspects identical to the powers of a Florida

---

**24.** The Court expressly reserved the issue of whether a state governor enjoys the same status as the legislature and supreme court for purposes of the state-action doctrine. *See* 466 U.S. at 568 n. 17, 104 S.Ct. at 1995 n. 17.

**25.** *See supra* note 22.

**26.** We note that the immunity from damages provided by the Local Government Antitrust Act

of 1984, § 3, 15 U.S.C. § 35 (1988), does not apply to HHMC because the district court entered its order in this case prior to the effective date of the Act. *See id.* § 3(b), 15 U.S.C. § 35(b) ("existence of a ... district court judgment ... shall be deemed to be prima facie evidence that subsection (a) of this section [providing for local government immunity] shall not apply").

municipality. *Compare* Fla.Stat. chs. 166, 170 (1987) (general municipality powers) *with* 1979 Fla.Laws ch. 79–577 (HHMC enabling legislation). Given the similarities between HHMC and Florida municipalities, we conclude that HHMC's actions should be tested by *Town of Hallie* and its progeny.

In *Town of Hallie*, the Supreme Court held that when a municipality engages in anticompetitive conduct pursuant to a "clearly expressed state policy," the conduct constitutes state action for the purposes of *Parker* even without a showing of active state supervision. 471 U.S. at 40, 47, 105 S.Ct. at 1717, 1720. HHMC argues that it is protected by *Town of Hallie* because it acted pursuant to a clearly expressed state policy to displace competition in the hiring of physicians. We disagree.

The Court in *Town of Hallie* noted that if anticompetitive conduct is a foreseeable result of a legislative grant of power to a municipality, then the municipality would be said to have acted pursuant to a clearly expressed state policy. *Id.* at 41–42, 105 S.Ct. at 1718. By analogy, one could correctly say that when Florida's legislature authorized peer review in licensed medical facilities, *see* Fla.Stat. § 395.011(5), (6) (1987), it could foresee that HHMC would rely on recommendations made by a physician's peers and refuse to deal with (i.e., boycott) that physician. Thus, by granting HHMC the virtually unreviewable power to hire (or not hire) "agents and employees as may be advisable," the Florida legislature clearly articulated a policy to displace competition, at least to the extent that an HHMC decision not to hire a physician can be considered a boycott.

While the Florida legislature must have foreseen that HHMC would engage in anticompetitive conduct based on recommendations of the physician's peers, nothing indicates that the legislature should have foreseen the type of anticompetitive conduct alleged in this case. Dr. Bolt has alleged that HHMC not only relied on the peer review committee's recommendations but also *conspired* with that committee to deny his privileges on pretextual grounds. If

HHMC did conspire, as Dr. Bolt alleges, its conduct constitutes anticompetitive conduct that is not a foreseeable result of HHMC's enabling legislation and that is, in fact, prohibited by the requirement that HHMC act in a manner consistent with "the public good," 1979 Fla.Laws ch. 79–577, § 5. *See Stewart v. Stearns & Culver Lumber Co.*, 56 Fla. 570, 48 So. 19, 25 (1908) (Any "*agreement* that in its operation has or may have a tendency ... to unnaturally control the supply of or to increase the price of or to curtail the opportunity of obtaining useful commodities ... is regarded as ... inimical to the public welfare, and therefore against public policy." (emphasis added)).

This court has held that even when state policy displaces unrestrained competition, a municipality-like entity that enters into an unauthorized conspiracy to restrain competition may not claim the protection of *Town of Hallie*. *See Commuter Transp. Sys. v. Hillsborough County Aviation Auth.*, 801 F.2d 1286, 1290–91 (11th Cir.1986); *see also Independent Taxicab Drivers' Employees v. Greater Houston Transp. Co.*, 760 F.2d 607, 611 (5th Cir.1985) (city not subject to antitrust constraints where it has *reasonably* exercised state-granted authority), *cert. denied sub nom. Arrow Northwest, Inc. v. Greater Houston Transp. Co.*, 474 U.S. 903, 106 S.Ct. 231, 88 L.Ed.2d 230 (1985). Clearly, Dr. Bolt has alleged that HHMC entered into an unauthorized and unforeseeable conspiracy, and if he is able to prove his allegations, then HHMC's *ultra vires* conduct will not be exempt from antitrust scrutiny.

### C.

Finally, we come to the alleged community-wide conspiracy. The alleged co-conspirators here are DCH, HHMC, OBMH, the members of their medical staffs who participated in the decisions to revoke Dr. Bolt's staff privileges, and VCMS. Dr. Bolt alleges that these defendants conspired to drive him out of the Daytona Beach medical community.

In addressing the question whether the district court erroneously concluded that

the evidence of concerted action was insufficient to send the case to the jury, we divide our discussion into two parts. First, we discuss the evidence that relates to the alleged involvement of the three hospitals and their staffs. We then examine separately the evidence that relates to the alleged involvement of VCMS.

### 1.

The evidence that was admitted at trial relating to the alleged involvement of the three hospitals and their staffs can be broken down into three categories: (1) evidence of parallel action, (2) evidence of inter-hospital communication, and (3) direct evidence that the decisionmakers at the three hospitals agreed among themselves to take concerted action to drive Dr. Bolt out of the Daytona Beach medical community.

The evidence of parallel action was that, during the months of September and October 1981, the executive committees at each hospital voted to recommend that Dr. Bolt be denied both elevation to active staff membership and reappointment.

The evidence of inter-hospital communication falls into three subcategories. First, there was evidence that the individual defendants had ample opportunity to communicate among themselves about Dr. Bolt. Each of the individual defendants held staff privileges at more than one of the three hospitals; most of them held staff privileges at all three. Second, there was evidence of actual inter-hospital conversations about Dr. Bolt. For example, Dr. Smith, chief of staff at HHMC, approached Dr. Boye, chief of staff at DCH, in January 1981 and suggested that Dr. Boye encourage Dr. Bolt to seek counseling through the Impaired Physicians Program.[27] Third, there was evidence that each hospital's executive committee based its decision, at least in part, on Dr. Bolt's alleged misconduct at one of the other two hospitals. For

example, as we note above, after the HHMC executive committee voted to revoke Dr. Bolt's privileges, it sent him a letter listing eight grounds for its decision; three of those grounds pertained to incidents that occurred at DCH. Moreover, Dr. Bolt testified that Dr. France, chief of staff at OBMH, told him that the OBMH executive committee based its decision solely on incidents that occurred at DCH and HHMC.

Dr. Bolt's testimony was offered as the only direct evidence that the decisionmakers at the three hospitals had agreed among themselves to drive Dr. Bolt out of the Daytona Beach medical community. Dr. Bolt testified that Dr. Marino, chief of surgery at DCH, told him that he, Dr. Marino, had reported to the DCH credentials committee the following remarks of Dr. Stose, chief of surgery at OBMH: "They're going to get rid of [Dr. Bolt] at [HHMC]; therefore, we got to talk about getting rid of him at [OBMH]." Dr. Bolt also testified that Dr. Marino told him that he, Dr. Marino, had told the DCH Credentials Committee: "Listen, here's the plan. They're going to get rid of him at [HHMC]. That means we're going to get rid of him at [OBMH] and I think because [the] other two hospitals are going to get rid of him, we've got to seriously think of getting rid of him at [DCH]."

We conclude that this evidence, which was admitted at trial, was not sufficiently probative of conspiracy to withstand the motions for directed verdicts. The rule in this circuit is that evidence of conscious parallelism does not permit an inference of conspiracy unless the plaintiff establishes that each defendant engaging in the parallel action acted contrary to its economic self-interest. *See Pan–Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 559 (5th Cir.1980), *cert. denied*, 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981). Thus, the plaintiff must establish that each defendant would have acted unreasonably in

---

27. Additionally, in December 1981, Dr. Boye appeared in proceedings before the HHMC judicial review committee in connection with its review of the HHMC executive committee's decision to revoke Dr. Bolt's privileges. Dr. Mari-

no, chief of surgery at DCH, also appeared at those proceedings. Dr. Patel, chief of staff at OBMH, testified at the September 10, 1981 meeting of the DCH credentials committee.

a business sense if it had engaged in the challenged conduct unless that defendant had received assurances from the other defendants that they would take the same action. This record contains no evidence that any such assurances were received.

■ The evidence of inter-hospital communication is also insufficient to permit an inference of conspiracy. It is well settled that the mere opportunity to conspire among antitrust defendants is insufficient to permit the inference of conspiracy. *See Cooper v. Forsyth County Hosp. Auth.,* 789 F.2d 278, 281 (4th Cir.), *cert. denied,* 479 U.S. 972, 107 S.Ct. 474, 93 L.Ed.2d 418 (1986); *see also Oreck Corp. v. Whirlpool Corp.,* 639 F.2d 75, 79 (2d Cir.1980), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981); *Feldman v. Jackson Memorial Hosp.,* 571 F.Supp. 1000, 1008 (S.D.Fla.1983), *aff'd,* 752 F.2d 647 (11th Cir.), *cert. denied,* 472 U.S. 1029, 105 S.Ct. 3504, 87 L.Ed.2d 635 (1985). That the defendants might have talked among themselves about Dr. Bolt's difficulties at the various hospitals is also insufficient to permit an inference of conspiracy. *Cf. Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 763–64, 104 S.Ct. 1464, 1470–71, 79 L.Ed.2d 775 (1984); *Maple Flooring Mfrs. Ass'n v. United States,* 268 U.S. 563, 577–78, 45 S.Ct. 578, 583, 69 L.Ed. 1093 (1925); *Cement Mfrs. Protective Ass'n v. United States,* 268 U.S. 588, 605–06, 45 S.Ct. 586, 592, 69 L.Ed. 1104 (1925). The same is true with regard to the evidence that the executive committees based their decisions on Dr. Bolt's misconduct at the other hospitals. Such evidence does not permit an inference of conspiracy as long as the defendants' actions are attributable to legitimate, independent business reasons.[28] The evidence admitted at trial provides no indication to the contrary.

Finally, the statements by Dr. Marino fail to show the kind of multi-hospital conspiracy that Dr. Bolt alleges. The statements merely established that Dr. Marino told the DCH credentials committee (1) that he was aware that the OBMH executive committee was considering revoking Dr. Bolt's privileges based on what had occurred at HHMC, and (2) that since the other two hospitals were considering revoking or had already revoked Dr. Bolt's privileges, DCH should consider doing the same. At most, these statements show that the DCH credentials committee knew of Dr. Bolt's difficulties at the other hospitals and that it might have based its own recommendation at least in part on that information.[29]

In sum, none of the evidence admitted at trial permits an inference of a multi-hospital conspiracy. Viewed in the light most favorable to Dr. Bolt, the evidence merely establishes that decisionmakers at each one of the three hospitals based their decisions at least in part on matters that occurred at the other two hospitals. As we have explained, such evidence by itself does not permit an inference of conspiracy.

That the evidence submitted is insufficient to take the case of community-wide conspiracy to the jury does not, however, end our inquiry. We must also determine whether the district court erroneously excluded admissible evidence that was probative of the community-wide conspiracy.

■ As we discuss above, the district court erroneously prohibited Dr. Bolt from submitting evidence that challenged grounds for the defendants' reappointment decisions. Dr. Bolt proposed to show that all three hospitals relied on findings of the DCH investigation that were entirely base-

---

**28.** A hospital might have a number of legitimate independent business reasons for disciplining a staff physician based on his or her misconduct at another hospital. For example, a hospital can, under some circumstances, incur tort liability for its failure to screen carefully its professional staff. *See, e.g., Elam v. College Park Hosp.,* 132 Cal.App.3d 332, 183 Cal.Rptr. 156, 161–65 (1982). That a hospital failed to take action against a staff member when it knew or

should have known of that member's misconduct at another hospital might very well be relevant to this species of liability.

**29.** Dr. Bolt places unwarranted emphasis on Dr. Marino's use of the word "plan." Placed in context, the reference is to a proposed course of action at DCH, not to some multi-hospital scheme.

less.[30] As we stated earlier, a factfinder could infer from this evidence, in addition to the evidence admitted at trial, that the parties relied on the same baseless conclusions as part of a scheme to achieve a common illicit end. Because the evidence as a whole could "tend[ ] to exclude the possibility that [the defendants] were acting independently," *see Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984), we set aside the directed verdicts in favor of the DCH defendants, the HHMC defendants, and the OBMH defendants with respect to their involvement in the community-wide conspiracy.

### 2.

■ The evidence relating to Volusia County Medical Society's alleged involvement in the community-wide conspiracy was as follows. VCMS was a local professional organization that published a periodical known as *The Stethoscope*. The December 1981 edition of this periodical contained an article, authored by the society's president, entitled "The Problem Physician." The article mentioned no particular physician by name but discussed generally the problems associated with physicians whose abrasive personalities disrupt the delivery of medical care in hospitals.

In his brief, Dr. Bolt describes the article in *The Stethoscope* as a clarion call to all physicians to band together and drive him out of the Daytona Beach medical community. He thus claims that VCMS, through its publication, allegedly became an active ringleader in the community-wide conspiracy.

We agree with the district court that this evidence is insufficient to permit an inference that VCMS engaged in concerted action with the other defendants. First, Dr. Bolt's evidence failed to show that the article was directed at him in particular; his conclusion that the author wrote the article with him in mind was pure speculation. More importantly, the supposed "clarion call" was published in December 1981, *after* the executive committees at the three hospitals had already taken action against Dr. Bolt. The evidence that VCMS played any part in the community-wide conspiracy was plainly insufficient to withstand the motion for directed verdict. We therefore affirm the directed verdict in favor of VCMS.

### III.

To summarize, we reverse the judgments entered on (1) the directed verdicts in favor of the DCH defendants with respect to their involvement in the DCH conspiracy, (2) the directed verdicts in favor of the HHMC defendants with respect to their involvement in the HHMC conspiracy, and (3) the directed verdicts in favor of the DCH defendants, the HHMC defendants, and the OBMH defendants with respect to their involvement in the community-wide conspiracy. We affirm the judgment in favor of VCMS.

We do not hesitate to say that the district court's handling of this case was unfortunate. The better course would have been to defer ruling on the motions for directed verdict until after Dr. Bolt had presented his entire section 1 case. In their briefs, the appellees vigorously argue that Dr. Bolt must prove, as part of his

---

**30.** It is not clear whether all three executive committees drew up formal lists of charges; if they did, Dr. Bolt did not introduce those documents into evidence. He did introduce a letter he received from the HHMC executive committee in which the committee cited the two DCH incidents as grounds for its own decision. With respect to the OBMH executive committee, the evidence shows only that it relied on unspecified incidents occurring at the DCH; no evidence was introduced showing that the OBMH executive committee relied specifically on the two DCH incidents in question. Nonetheless, we think that the jury could infer from the evidence before it that the OBMH executive committee did rely on those incidents; the evidence does show that an administrator at OBMH contacted an administrator at DCH and requested information from Dr. Bolt's disciplinary file. Of course, the OBMH defendants will have the opportunity to show, on remand, that they did not rely on DCH incidents or that the DCH incidents upon which they relied did not include the two incidents to which Dr. Woodward's testimony pertains.

section 1 case, that their actions actually restrained competition; they contend that the directed verdicts were proper because the evidence adduced at trial was wholly deficient in this regard. Whatever the theoretical merits of their legal arguments, the fact remains that the district court entered the directed verdicts before Dr. Bolt reached that part of his case involving restraint on competition. We reiterate that our focus in this appeal has been a narrow one: whether Dr. Bolt's evidence with respect to the contract, combination, or conspiracy element of his section 1 claims was sufficient to withstand the motions for directed verdict. Other potential legal issues in this case are better left for resolution on the basis of a more fully developed record.

AFFIRMED in part, REVERSED in part, and REMANDED.