**Owen D. OKSANEN, M.D.,
Plaintiff–Appellant,**

**v.**

**PAGE MEMORIAL HOSPITAL; J.R. Holsinger, M.D.; Romulo Ancheta, M.D.; Fang S. Horng, M.D.; James G. Dale, M.D., Defendants–Appellees.**

**No. 89–1768.**

United States Court of Appeals,
Fourth Circuit.

Argued March 6, 1990.

Decided Aug. 9, 1990.

Rehearing In Banc Granted Sept. 30, 1990.

Edward B. Lowry, argued (Robert W. Jackson, on brief), Michie, Hamlett, Lowry, Rasmussen & Tweel, P.C., Charlottesville, Va. and (Sheldon Braiterman, on brief), Baltimore, Md., for plaintiff-appellant.

Gregory Thomas St. Ours, argued (Phillip C. Stone, Wharton, Aldhizer & Weaver, Harrisonburg, Va., Stephen L. Altman, Donahue, Ehrmantraut & Montedonico, Fairfax, Va., Roy V. Wolfe, III, Julias, Blatt & Blatt, Harrisonburg, Va., Norman

F. Slenker, Slenker, Brandt, Jennings & Johnston, Fairfax, Va., Edward M. Burns, II, Poindexter, Burns & Marks, Waynesboro, Va., Lynn Fleming, Crews & Hancock, Richmond, Va., and Mary S. Meade, Meade & Associates, P.C., Vienna, Va., on brief), for defendants-appellees.

Before MURNAGHAN, Circuit Judge, BUTZNER, Senior Circuit Judge, and KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.

FRANK A. KAUFMAN, Senior District Judge:

Dr. Owen D. Oksanen appeals the order of the district court granting summary judgment with regard to Oksanen's federal antitrust and pendent state claims. For the reasons stated below, we reverse that order and remand to permit Dr. Oksanen additional discovery, and for whatever trial opportunity to which he may, after such discovery, be entitled.

## I.

After finishing a three-year residency at the University of Virginia Hospital in 1978, Dr. Oksanen moved to Luray (Page County), Virginia, to practice family medicine. Upon arrival, Oksanen rejected an offer to practice in the office of defendant Dr. J.R. Holsinger (another general practitioner), preferring instead to open his own office as a sole practitioner. After a probationary period of one year, Dr. Oksanen applied for full medical privileges at Page Memorial Hospital (Page Memorial), a small (54 beds) community hospital which constitutes the only hospital in Page County. Although Dr. Holsinger opposed Oksanen's application, the appellant received the support of defendants Dr. Fang S. Horng and Dr. Romulo Ancheta, two Page Memorial surgeons, and at least one other of Page Memorial's five-physician staff and his application for full medical privileges was approved.

Soon after Oksanen began practicing at Page Memorial, the administration began receiving complaints about his behavior. From 1979 to 1983, the record reveals a lengthy list of claims of abusive conduct toward nurses, laboratory staff, and administrative personnel.[1] At the same time, Dr. Oksanen's complaints regarding his physician colleagues grew. In his affidavit, Oksanen stated that because of his deep concern over the quality of care at Page Memorial, he began referring many patients to the University of Virginia Hospital and other facilities which, in his opinion, provided a "better quality of specialized medical service." According to Dr. Oksanen, "the principal problems with medical care concerned the failure of Drs. Horng and Ancheta to realize their own limitations as to what surgery should be handled by them and what surgery required better facilities and surgeon[s]...."

In May 1983, with relations between Dr. Oksanen and the nursing staff worsening,[2] hospital administrator John Berry asked the medical staff, which consisted of all the individual defendants except newly arrived general practitioner Dr. James G. Dale, to investigate Oksanen's conduct and take any necessary "corrective action." The medical staff concluded that no disciplinary action was necessary. In July 1983, however, Dr. Oksanen engaged in two incidents which further antagonized the medical staff and the hospital Board of Trustees (Board). First, the appellant, in reaction to a letter sent by Board President T.C. Berrey to all physicians, told the Board that its attempt to create a more hospitable environment was "demeaning and insulting." Oksanen added that he was "not sure that the collection of individuals that make up the hospital Board have sufficient background, training or what have you to function appropriately in reviewing the activities of physicians." Second, Dr. Oksanen got into a public shouting match with Dr.

1. The record also reveals that Dr. Oksanen's practice grew vigorously, as the appellant had approximately 5,000 charts by 1983. According to Dr. Oksanen, the average physician in Luray had 1,000 to 2,000 charts.

2. Although relations between the nursing staff and all Page Memorial physicians had deteriorated, the nurses were particularly upset over Oksanen's public reprimand of a nurse and her supervisor.

Horng after Oksanen told one of Horng's patients that a prescribed medication was potentially life-threatening.

At its next meeting, the Board, in response to the suggestions of Dr. Ancheta (Chief of the Medical Staff) and Administrator Berry, strongly recommended that the Medical Staff take corrective action. After reviewing testimony from 19 witnesses regarding the appellant's behavior, the Executive Committee of the Medical Staff voted 3–1 (with Dr. Oksanen the only dissenter) to revoke Dr. Oksanen's staff privileges. The Board of Trustees, after considering the protests of Dr. Oksanen and his lawyer, voted 9–2 to suspend Oksanen's privileges for three months (until December 31, 1983), to be followed by a one-year probationary period.

In the wake of Oksanen's suspension, a group called the Concerned Citizens mounted a campaign which resulted in the election of four members to the Board, ousting Dr. Holsinger in the process. Those events, along with newspaper statements made by Dr. Oksanen about the poor quality of surgical care at Page Memorial, did not ease Dr. Oksanen's return to practice in January 1984. After Oksanen was again practicing at Page Memorial, several physicians "embarked," according to the appellant, on a course of selective enforcement of the hospital's regulations, such as refusing to provide emergency room coverage for Oksanen's patients. Additionally, the other doctors refused to cover for Oksanen during his absences or name the appellant to any hospital committees. With complaints about Dr. Oksanen rising again, the Board of Trustees voted in May 1984 to request the medical staff to take further corrective action against him. The Executive Committee of the Medical Staff met on June 22, 1984, and voted to recommend to the Board that Oksanen's staff privileges be revoked permanently. Five days later, Dr. Oksanen resigned from the Page Memorial medical staff.

3. Despite his resignation from Page Memorial, Oksanen remained on staff at Shenandoah Hospital in Woodstock, Virginia, and believed that his privileges there entitled him to use Page Memorial's facilities.

After his resignation, Dr. Oksanen claimed that the Page Memorial staff refused his patients access to ancillary services and diverted his patients to other physicians.[3] However, Oksanen continued to practice medicine in Virginia through 1984 and subsequently was reprimanded, in accordance with a consent decree by the Virginia Board of Medicine, for practicing medicine with a suspended license, for negligence in the death of a patient, and for unprofessional conduct. Thereafter, Dr. Oksanen's practice suffered greatly and, after working in a series of part-time physician arrangements, he finally settled in Florida.

## II.

On June 13, 1988, Dr. Oksanen filed a complaint in the court below against Page Memorial and Drs. Holsinger, Ancheta, Horng, and Dale, setting forth antitrust claims under Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and asserting pendent state claims under the Virginia Antitrust Act, and also for civil conspiracy, tortious interference with contract, and defamation.[4] In essence, Dr. Oksanen claimed that the defendants collectively forced him from practice and conspired to restrain competition in, and monopolize, the practice of medicine in Page County. This was done, according to Oksanen, because the defendant physicians felt professionally and economically threatened by the brash "new kid on the block."

The defendants then filed motions to dismiss and/or for summary judgment, and the district court calendared those motions for oral argument on November 7, 1988. Between June and November 1988, both parties submitted affidavits, transcripts of hospital disciplinary meetings, and correspondence in support of their respective positions. Dr. Oksanen also responded to interrogatories submitted by Drs. Dale and Horng. Dr. Oksanen served his own deposition requests, interrogatories, and production of documents requests on the individual defendants on October 20, 1988.

4. The defamation count was subsequently dropped in plaintiff's amended complaint.

Those discovery requests were never answered, however, because the district court stayed all discovery at the oral argument on November 7, pending a decision on the defendants' motions.

Although discovery had been stayed since the previous November, the district court granted summary judgment in favor of all defendants on June 16, 1989. The district court found that the documentary exhibits and correspondence were insufficient to establish the required concerted action under section 1 of the Sherman Act. Instead, the court concluded that "the recurring litany of complaints concerning [Oksanen] provides ample evidence that the individual defendants were not conspiring to restrain trade or to injure Dr. Oksanen...." Regarding the Sherman section 2 claim, the district court concluded that the "various actions" taken against Oksanen "do not suggest the willful maintenance of monopoly power," but were instead "motivated by professional concerns over the impact of Dr. Oksanen's behavior on hospital morale and, ultimately, on patient care." Finally, the district court dismissed the pendent state claims for essentially the same reasons. This appeal followed. We conclude that a remand is required.

III.

Section 1 of the Sherman Act requires proof of a "contract, combination ..., or conspiracy, in restraint of trade." 15 U.S.C. § 1 (1982). "Concerted action is the essence of a Section 1 claim." *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.*, 763 F.2d 604, 610 (4th Cir.1985). Here, the alleged conspiracy occurred among the Board members and administrative staff of Page Memorial and its medical staff, all of whom participated in the peer review decision to revoke Dr. Oksanen's privileges. Invoking the intracorporate immunity doctrine, the defendants maintain that, as a matter of law, members of a hospital medical staff are incapable of conspiring with either themselves or with their hospital for Sherman section 1 purposes. We address that threshold legal argument first.

A.

[redacted] Unilateral conduct by a single entity does not implicate section 1 of the Sherman Act regardless of the magnitude of the restraint on competition. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767, 104 S.Ct. 2731, 2739, 81 L.Ed.2d 628 (1984). In *Copperweld*, the Supreme Court concluded that "officers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy." 467 U.S. at 769, 104 S.Ct. at 2741. "The officers of a single firm," the Court declared, "are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals." *Id.* In indicating that a hospital may be legally incapable of conspiring with its medical staff under section 1, the Third and Sixth Circuits have relied upon the *Copperweld* rule that a corporation cannot conspire with its officers and directors. *See Potters Medical Center v. City Hosp. Ass'n*, 800 F.2d 568, 573 (6th Cir.1986) (hospital cannot conspire with one of its attorneys and one of its physicians); *Weiss v. York Hosp.*, 745 F.2d 786, 813–17 (3d Cir. 1984) (hospital and medical staff), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985).[5] Recently, however, two of our sister circuits have reached the conclusion, in factual contexts similar to this case, that a hospital and members of its medical staff are separate entities for Sherman section 1 purposes. *Bolt v. Halifax Hosp. Medical Center*, 891 F.2d 810, 819 (11th Cir.1990); *Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440, 1450 (9th Cir.1988).

In *Bolt*, the Eleventh Circuit noted that the *Copperweld* rule was "necessary [in the corporate context] to prevent erosion of

5. The Third Circuit in *Weiss* did hold, however, that members of a medical staff could conspire with one another for Sherman section 1 purposes. Judge Becker concluded that each medical staff member "has an economic interest separate from and in many cases in competition with the interests of other medical staff members. Under these circumstances, the medical staff cannot be considered a single economic entity for purposes of antitrust analysis." 745

the principle that section 1 does not reach unilateral acts." 891 F.2d at 819. That rule for corporations stood in contrast to the hospital structure, the court concluded, because in the hospital context, "[a] hospital and the members of its medical staff ... are legally separate entities, and consequently no similar danger exists that what is in fact unilateral activity will be bootstrapped into a 'conspiracy.'" *Id.* Earlier, in *Oltz*, the Ninth Circuit stated that the interests of a medical staff "were not as wed as the ties between a corporation and its officers or employees." 861 F.2d at 1450. Therefore, Judge Hug concluded that the interests of certain anesthesiologists "were sufficiently independent so that the collaborated conduct between the anesthesiologists and [the hospital] coalesced economic power previously directed at disparate goals." *Id.*

We find the approach of *Bolt* and *Oltz* persuasive. "Not only do hospital staff doctors have interests that diverge from each other, but they have interests that may well be out of sync with the interests of the hospital." Blumstein & Sloan, *Antitrust and Hospital Peer Review*, Law & Contemp. Probs. 7, 51 (1988); *see also* Kissam, Webber, Bigus & Holzgraefe, *Antitrust and Hospital Privileges: Testing the Conventional Wisdom*, 70 Calif.L.Rev. 595, 639–40 (1982) (concluding that a medical staff may conspire with its hospital for section 1 purposes because physicians are "outside agents" of the hospital and "independent entrepreneurs"). Here, the physicians on the Page Memorial medical staff operated not as agents of Page Memorial during the peer review process but instead as independent sole practitioners, pursuing in many instances personal economic interests. Consequently, we hold that the peer review decisions of a hospital and its medical staff members may be subject to the penalties of section 1 of the Sherman Act.

## B.

■ That the members of a medical staff may conspire with each other and with hospital personnel does not mean, however, that the conspiracy requirement of section 1 is automatically satisfied. To meet that requirement, Dr. Oksanen must of course also prove that the members actually did conspire. *Bolt*, 891 F.2d at 819. In granting summary judgment with respect to all of Dr. Oksanen's claims, the district court concluded that the plaintiff presented insufficient evidence of conspiratorial conduct. However, the district court reached that conclusion without permitting Dr. Oksanen an opportunity to depose witnesses or serve interrogatories. Although both parties did submit voluminous exhibits and affidavits to the court prior to the summary judgment hearing, the interrogatories sent by the plaintiff had not been returned when the district court stayed all discovery pending the disposition of the motions for summary judgment.

Consequently, Dr. Oksanen argues on appeal that the district court acted without having afforded him any opportunity to discover "the files of the Hospital or any of the doctors or to depose or cross-examine any of the Doctors or any of their potential witnesses." Appellant's Br. at 11. In reviewing the district court's order, we are guided by the Supreme Court's recent exposition of the principles of summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Industrial Co. v. Zenith*

F.2d at 815. For ourselves, we are not willing to apply *per se* the statement in *Weiss* that a "hospital cannot legally conspire with its medical staff," *id.* at 815; rather, we are of the view that, in a case such as this one, there can be a conspiratorial agreement among medical staff members for purposes of section 1. In so concluding, we note that the intra-medical staff conspiracy issue was not resolved in *Cooper v. Forsyth County Hosp. Authority, Inc.,* 789 F.2d 278, 282 (4th Cir.), *cert. denied,* 479 U.S. 972, 107 S.Ct. 474, 93 L.Ed.2d 418 (1986). *Compare*

789 F.2d at 281 n. 12 (Ervin, J.) ("question[ing]" holding in *Weiss* that "*any* action taken by the medical staff satisfies the 'contract, combination, or conspiracy' requirement of section 1") (quoting *Weiss,* 745 F.2d at 814) (emphasis added), *with id.* at 282 (Motz, J., concurring) ("in my view Section 1 of the Sherman Act clearly prohibits members of a medical-dental staff from agreeing with one another to coerce a hospital's trustees to deny privileges to members of a competing profession....").

*Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). As recently stated by the Eleventh Circuit, the "common denominator" of those cases "is the [Supreme] Court's caveat that summary judgment may only be decided upon an adequate record." *WSB–TV v. Lee,* 842 F.2d 1266, 1269 (11th Cir.1988). In *Celotex,* the Court held that Rule 56(c), Fed.R.Civ.P., mandates the entry of summary judgment in certain instances but only "after adequate time for discovery." 477 U.S. at 322, 106 S.Ct. at 2552. In concluding that the district court had properly granted summary judgment, the Court noted that "[t]he parties had conducted discovery, and no serious claim can be made that [the nonmovant] was in any sense 'railroaded' by a premature motion for summary judgment." *Id.* at 326, 106 S.Ct. at 2554. Similarly, in *Anderson,* the Court declared that summary judgment should be "refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." 477 U.S. at 250 n. 5, 106 S.Ct. at 2511 n. 5. Finally, in *Matsushita,* the Court considered it significant that the parties had conducted "several years of detailed discovery." 475 U.S. at 578, 106 S.Ct. at 1351.

Appellate courts, both before and after the above three cases were decided, consistently have reversed summary judgment dispositions when the nonmovant has not had sufficient opportunities for discovery.[6] In *Sames v. Gable,* 732 F.2d 49 (3d Cir. 1984), the district court granted summary judgment in spite of the fact that plaintiffs' interrogatories remained unanswered. Vacating and remanding for further discovery, the court of appeals emphasized that it had previously "criticized the practice of granting summary judgment motions at a time when pertinent discovery requests remain unanswered by the mov-

ing party[.]" 732 F.2d at 51 (citing to and quoting from *Costlow v. United States,* 552 F.2d 560, 564 (3d Cir.1977) (district court abused its discretion in granting summary judgment with discovery requests outstanding)). An analogous situation presented itself in *Snook v. Trust Co. of Georgia Bank of Savannah,* 859 F.2d 865 (11th Cir.1988), where the district court had granted summary judgment while plaintiffs' motion to compel documents was pending. Reversing, the panel concluded that "[g]enerally summary judgment is inappropriate when the party opposing the motion has been unable to obtain responses to his discovery requests." 859 F.2d at 870. *See also Murrell v. Bennett,* 615 F.2d 306, 310 (5th Cir.1980).

Permitting adequate discovery before summary disposition applies with even greater force in the antitrust context. The Supreme Court, in *Hospital Bldg. Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 746, 96 S.Ct. 1848, 1853, 48 L.Ed.2d 338 (1976), noted that "in antitrust cases, 'where the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly" (citations omitted). Since *Rex Hospital,* several courts have reversed grants of summary judgment in antitrust cases, especially when the disputed issues revolve around intent and motive. *See Arnold Pontiac–GMC, Inc. v. General Motors Corp.,* 786 F.2d 564, 572 (3d Cir.1986) (reversing summary disposition on Sherman Act section 1 claim); *George C. Frey Ready–Mixed Concrete v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 555 (2d Cir.1977). Of course, antitrust plaintiffs are not entitled to boundless discovery, and there are certainly many instances where summary judgment is appropriate in the antitrust context,[7] but we cannot say that this is one of those rare cases where dis-

---

**6.** Several circuits have held, however, that nonmovants must invoke Rule 56(f), Fed.R.Civ.P., and bring any remaining discovery to the court's attention in order to preserve the lack-of-discovery argument for appeal. *See, e.g., Reflectone, Inc. v. Farrand Optical Co., Inc.,* 862 F.2d 841, 844 (11th Cir.1989). Rule 56(f) provides that a district court may "order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had...." Al-

though Oksanen did not ask the district court to issue such a continuance under Rule 56(f), such a request was not required in this case where discovery had been stayed and where interrogatories already issued remained unanswered.

**7.** *See, e.g., White v. Rockingham Radiologists, Ltd.,* 820 F.2d 98, 102 (4th Cir.1987) (summary judgment upheld because "party opposing sum-

covery may be curtailed to the extent it was curtailed by the district court. Accordingly, without commenting on whether Dr. Oksanen will be able to survive pre-trial motions and get to trial, or prevail ultimately if this case goes to trial, we conclude that he must be permitted further to depose defendants and receive answers to interrogatories. We thus reverse the dismissal of the section 1 count, and remand for further proceedings in the district court.

## IV.

■ Count II of plaintiff's complaint alleged that the defendants violated section 2 of the Sherman Act, 15 U.S.C. § 2 (1982), by engaging in monopolization and conspiracy to monopolize. The district court dismissed the monopolization claim, concluding that the "various actions taken against Dr. Oksanen do not suggest the willful maintenance of monopoly power, but were motivated by professional concerns over the impact of Dr. Oksanen's behavior on hospital morale and, ultimately, on patient care." Relying on its finding of no concerted action in the section 1 count, the district court found the conspiracy claim in the section 2 count deficient as well.

The offense of monopolization under section 2 consists of "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 n. 19, 105 S.Ct. 2847, 2854 n. 19, 86 L.Ed.2d 467 (1985) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966)). To satisfy the element of willful acquisition or maintenance of monopoly power, "[the

plaintiff] must show that a jury could find no valid business reason or concern for efficiency in the hospital's [actions]." *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 105 (4th Cir.1987). Similarly, the offense of conspiracy under section 2 "requires proof of (1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize." *Volvo North America Corp. v. Men's Int'l Professional Tennis Council*, 857 F.2d 55, 75 (2d Cir.1988) (citations omitted).

We cannot say with entire certainty, at this stage of the discovery process, that plaintiff will not be able to demonstrate the necessary monopoly power and willful acquisition of that power, or that the motives of the hospital and the defendant physicians could not be seen as predatory. While on the basis of the record as it presently exists, plaintiff's ability to survive summary judgment with respect to count II would appear doubtful, questions do remain with respect to the motives of the several defendants and the definition of the relevant market area, including whether that market covers all the outlying counties urged by Page Memorial.[8] Thus, the bottom line regarding the present status of plaintiff's section 2 claim is that, as we have stated *supra* with respect to the section 1 claim, although dismissal and/or summary judgment may well result after appropriate further discovery, a remand is required on count II as well as count I to permit such discovery.

## V.

Having remanded the plaintiff's federal antitrust claims for further discovery, we now turn to the remaining pendent state law claims. In counts III–V of his amended complaint, Dr. Oksanen alleged a violation of the Virginia Antitrust Act, the Virginia Business Conspiracy Act, and a claim for intentional interference with contracts. Relying on its finding that plaintiff failed

mary judgment [did not] present evidence that tends to exclude the possibility that the alleged conspirators acted independently"); *Cooper,* 789 F.2d at 281 (same; also noting that "mere contacts and communications, or the mere opportunity to conspire, among antitrust defendants is insufficient evidence from which to infer an anticompetitive conspiracy in the context of the denial of hospital surgical privileges").

8. The appellees argue that Page Memorial has a market share of only 5.2% "when considering the principal counties and cities from which Page Memorial [and other hospitals] draw patients." Appellees' Br. at 34.

to produce sufficient evidence of a conspiracy, the district court dismissed counts III and IV. In dismissing count V, the district court held that the loss of staff privileges was not proximately caused by the defendants, but rather by Dr. Oksanen's disruptive behavior.

■ With respect to the state antitrust claim, Va.Code Ann. §§ 59.1–9.1 *et seq.*, the elements of that cause of action are the same as those required under the Sherman Act (except for the interstate commerce component). *See Satellite Television v. Continental Cablevision*, 714 F.2d 351, 358 n. 13 (4th Cir.1983). Therefore, for the reasons discussed above, we remand the dismissal of that claim for further discovery. As to the state business conspiracy claim, Va.Code Ann. §§ 18.2–499, 18.2–500, which requires the plaintiff to show a willful, malicious conspiracy with resulting damages, *see Allen Realty Corp. v. Holbert*, 227 Va. 441, 449, 318 S.E.2d 592, 596 (1984), we remand for similar reasons for a further inquiry into such alleged conspiratorial conduct.

■ The same result must also apply to count V, the intentional interference with contract claim, which alleged that the defendants interfered with Dr. Oksanen's contractual relationship with Page Memorial, with his patients, and with a nearby nursing home. Finding its "prior evidentiary analysis equally applicable," the district court dismissed those claims because Oksanen had not shown that the defendants' conduct induced or caused a breach or termination in those contractual relationships.[9] Given what has been said, we cannot say now, at this stage of the discovery process, that no genuine issue of material fact exists regarding the cause of Dr. Oksanen's loss of privileges.

## VI.

In remanding, we note that once there is an adequate record, the district court may again consider the defendants' motion for summary judgment.

REVERSED AND REMANDED.

9. To maintain a claim in Virginia for tortious interference with a contract, a plaintiff must demonstrate "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional inter-

*On Petition for Rehearing with Suggestion for Rehearing In Banc*

The appellees' petition for rehearing and suggestion for rehearing in banc were submitted to the Court. A majority of judges having voted in a requested poll of the Court to grant rehearing in banc,

IT IS ORDERED that the rehearing in banc is granted.

IT IS FURTHER ORDERED that this case shall be calendared for argument at the February 1991 Session of Court. Within ten days of the date of this order five additional copies of appellant's briefs; five additional copies of appellees' briefs; five additional copies of the reply brief shall be filed; and appellees will file ten additional copies of Volume 1 and Volume 2 of the joint appendix.

ference inducing or causing a breach or termination of the relationship; and (4) resultant damages to the party whose relationship or expectancy has been disrupted." *Chaves v. Johnson*, 230 Va. 112, 120, 335 S.E.2d 97, 102 (1985).