993 F.2d 1514
 1993-2 Trade Cases P 70,318
 Linda M. BOCZAR, M.D. and Obstetrics/Gynecology Women's
Group, Inc., Plaintiffs-Appellants,
v.
MANATEE HOSPITALS & HEALTH SYSTEMS, INC., d/b/a Manatee
Memorial Hospital; Baptist Hospitals and Health Systems,
Inc.; Richard Kaleba; Raymond L. Raitz, M.D.; Donna
McDonald; James N. Ganey, M.D.; James Derespino, M.D.,
Defendants-Appellees.
 No. 91-4103.
 United States Court of Appeals,
Eleventh Circuit.
 June 25, 1993.
 
 James Boczar, Sarasota, FL, Stephen Rubin, Stephen E. Nagin, Dwight Sullivan, Miami, FL, for plaintiffs-appellants.
 Richard R. Garland, Dickinson & Gibbons, Sarasota, FL, for defendants-appellees.
 Claire L. Hamner, G. Hunter Gibbons, Richard R. Garland, Dickinson, Gibbons, Shields, Partriedge, Dahlgren & Collins, Sarasota, FL, for Manatee Hospitals & Health Systems, Inc.
 David A. Webster, William E. Sumner, Sumner & Hewes, Atlanta, GA, for Boczar.
 Appeal from the United States District Court for the Middle District of Florida.
 Before EDMONDSON and CARNES, Circuit Judges, and HILL, Senior Circuit Judge.
 EDMONDSON, Circuit Judge:
 
 
 1
 In this antitrust conspiracy action, Linda Boczar, M.D., appeals from a judgment notwithstanding the verdict for defendant Manatee Hospitals & Health Systems, Inc.[1] We reverse.
 
 I. Background
 
 2
 Dr. Linda Boczar practiced obstetrics and gynecology ("ob/gyn") in Sarasota, Florida. Defendant-appellee Manatee Hospitals & Health Systems, Inc. ("Manatee" or "the hospital") operated Manatee Memorial Hospital, for profit, in nearby Bradenton, Florida. In 1988, Manatee's chief executive officer, Richard Kaleba, recruited Boczar to join Manatee's obstetrics staff. Kaleba thought Boczar would bring new patients and revenue to Manatee. Boczar applied for staff privileges at Manatee and opened an office in Bradenton.
 
 
 3
 When Manatee's credentials committee met to decide whether Boczar should join the staff, some incumbent staff obstetricians opposed granting Boczar privileges. The credentials committee recommended against granting Boczar privileges, but the executive committee and board of directors overrode the credentials committee's recommendation. Manatee granted Boczar staff privileges in June 1988.
 
 
 4
 Shortly into Boczar's tenure at Manatee, problems arose between Boczar and the hospital and its staff. These clashes included differences over Manatee's "call" scheduling procedures, excessive patient referrals, emergency room ("ER") staff members' diagnostic judgments, and anesthesia services.
 
 
 5
 Beginning in August, 1988, the Manatee executive committee began a series of "peer review" proceedings against Boczar for alleged infractions of professional standards and reported these proceedings to Florida's medical licensing agency, the Department of Professional Review (DPR).[2] These proceedings ended in suspensions of Boczar's staff privileges. In December 1988, Boczar resigned. Manatee reported to DPR that Boczar had resigned due to a "quality of care issue." DPR sent the report to all Florida hospitals and began its own investigation.
 
 
 6
 Boczar sued Manatee, four named physicians,[3] and "unnamed conspirators." Boczar's complaint included a claim that defendants conspired to restrain trade in violation of the Sherman Act, 15 U.S.C. § 1 et seq. Her Sherman Act claim went to trial. The jury found none of the four named physicians liable, but did find the hospital liable. The jury awarded Boczar $150,000 in damages, to be trebled under the anti-trust laws. Manatee moved for JNOV.
 
 
 7
 The district court granted JNOV for Manatee. In the light of the jury verdict in favor of the four physician defendants, the district court thought that Boczar had failed to show that the hospital conspired with anyone.[4] The district court also granted Manatee's motion for a new trial in case JNOV was reversed.
 
 
 8
 Boczar brought this appeal. She contends she is entitled to reinstatement of the jury's verdict. We agree.
 
 II. Discussion
 1. JNOV--Standard of Review
 
 9
 This appeal presents no significant dispute about the law. This case is about evidence and the facts the evidence can support. We review judgments n.o.v. de novo. We must view the evidence in the light most favorable to Dr. Boczar; and if the evidence substantially supports the jury's verdict, we must reverse the JNOV. Watts v. Great Atlantic and Pacific Tea Co., 842 F.2d 307, 309-311 (11th Cir.1988).[5]
 
 2. Evidence in Support of the Verdict
 
 10
 a. Evidence of Conspiracy to Restrain Trade
 
 
 11
 Dr. Boczar presented sufficient evidence that the hospital conspired with others to restrain her practice of medicine.[6] We have said that plaintiff physicians may properly rely on circumstantial evidence--"evidence of irrational conduct that would create an inference of conspiracy"--to prove a Sherman Act conspiracy claim. See Bolt v. Halifax Hosp. Med. Ctr., 891 F.2d 810, 819 (11th Cir.1990) (holding that hospitals may be found liable for conspiring with members of medical staff, and that evidence of pretextual, sham peer review proceedings presented jury question whether hospitals conspired with peer review committees in violation of Sherman Act).
 
 
 12
 Viewed in the light most favorable to her, Dr. Boczar's evidence: (1) showed that the "conspiracy alleged is ... one that would inure to the defendants' economic benefit;" (2) "tend[ed] to exclude the possibility that the alleged co-conspirators acted independently and in a manner consistent with rational business objectives;" and, (3) showed the conspiracy had an "anti-competitive effect." See id. at 819-20. The jury could have inferred the existence of an unlawful combination or conspiracy between the hospital and members of its staff or peer review committees. See id.; cf. Todorov v. DCH Healthcare Auth., 921 F.2d 1438, 1457 (11th Cir.1991) (affirming summary judgment for defendants where physician failed to disprove that hospital acted unilaterally to promote its independent, competitive interest).
 
 
 13
 (1) Evidence of Economic Benefit
 
 
 14
 Like the defendant in Bolt, cf. 891 F.2d at 820, Manatee Hospital argues that it recruited Boczar to bring in patients and revenue and so had no economic reason to take away her privileges. But we think that a jury could reasonably find from the evidence that, although the hospital had recruited Boczar for rational business reasons, the hospital later came to view Dr. Boczar's practice, through no real fault of hers, as inconsistent with its interests.
 
 
 15
 When Dr. Boczar joined its staff, Manatee Hospital had suffered defections by members of its ob/gyn staff and feared still more ob/gyn departures to a competing hospital. More than half of the remaining ob/gyn specialists, Dr. Boczar's most direct competitors,[7] openly opposed granting Dr. Boczar and her group privileges on the stated basis of the commuting distance between Sarasota and Bradenton and their accounts of Dr. Boczar's interpersonal disputes at her Sarasota hospital. There was evidence that Dr. Boczar's approach to her practice was not typical of Manatee ob/gyn physicians. For example, she performed significantly fewer C-section deliveries and charged a flat rate for all deliveries, Caesarean or natural. Boczar's prices were significantly lower than those of competing Manatee physicians. Given these special facts about this hospital and these doctors, the jury reasonably could infer that the hospital came to think that it would be better to lose Boczar and the revenue she generated than to keep her on staff and risk additional dissatisfaction and defections among her competitors on the Manatee ob/gyn staff.[8]
 
 
 16
 Most important, Dr. Boczar brought to the direct attention of Mr. Kaleba, the hospital's chief, a number of serious hospital deficiencies. Boczar detailed and documented her observations in writing. These charged deficiencies included excessive and unnecessary gynecological referrals, allegedly serious misdiagnoses by ER physicians, and sub-standard anesthesia services.[9] Because of the sub-standard anesthesia capabilities at Manatee, Dr. Boczar stopped performing deliveries and surgery at Manatee for all except her on-call patients. Dr. Boczar got little response to her criticisms. One month later, Dr. Boczar began to encounter a series of serious allegations about the quality of her own patient care.
 
 
 17
 The jury could reasonably have thought that Dr. Boczar's illumination of patient care problems increased the risk that the hospital--a for-profit institution--would incur costs and liabilities based on those deficiencies. In these circumstances, the jury could also infer that the hospital and its staff had economic reasons not only to try to remove Boczar, but to discredit her and damage her reputation.[10]
 
 
 18
 We conclude that one reasonable view of the evidence supports a finding that the hospital had an economic motive to conspire to restrain Boczar's practice. The jury could believe that the hospital would benefit economically by securing its pre-existing ob/gyn staff and revenues and also by avoiding or delaying costs caused by Dr. Boczar's complaints about patient care.
 
 
 19
 (2) Evidence Tending to Exclude Possibility of Legitimate Action
 
 
 20
 The hospital argues that its acts were legitimate peer review actions taken to address Boczar's alleged unavailability or slow response time when she was called to care for patients. Dr. Boczar introduced evidence, however, from which a jury reasonably could believe that the hospital consciously joined with members of its staff, including one or more un-named defendants, either to manufacture or to exaggerate these incidents. Fabricating damaging incidents or purposeful overreacting would be conduct that no reasonable medical practitioner or hospital could believe to be part of legitimate peer review.
 
 
 21
 The peer review proceeding charging Boczar with abandoning one of "her" patients who had come to the emergency room ultimately resulted in Dr. Boczar's resignation and suspension. One reasonable view of the evidence suggests that the incident was contrived. Jurors might reasonably have thought that the hospital, through its agents and with the cooperation of the staff physicians involved, drafted an affidavit which gives the false impression that Mossman appeared at the emergency room complaining of abdominal pain and asking to be treated by "her physician," Dr. Boczar.[11]
 
 
 22
 Dr. Boczar testified that when a member of the emergency room staff called her about Ms. Mossman, Dr. Boczar told the caller that Mossman was no longer her patient and so should see the ob/gyn doctor on call at that time. Dr. Watsky reported the incident to the hospital's executive committee, of which Watsky was a member. The executive committee then brought a meritless patient abandonment charge against Dr. Boczar, summarily suspended her, and reported the Mossman incident to DPR.
 
 
 23
 Mossman's testimony at trial, plus a second Mossman affidavit detailing the incident, supported Dr. Boczar's version of the facts. Mossman testified at trial that she told emergency room personnel that she had no current gynecologist. She also testified that she did not call Dr. Boczar before going to the emergency room, nor expected to be treated by Dr. Boczar for her illness, "because she wasn't my doctor." Mossman said that she had expected to be treated by the emergency room physician. In addition, Mossman testified that the hospital later called her and had her come to the hospital and sign the misleading affidavit without telling her of its contents or implications. A jury might reasonably have determined that the hospital and Dr. Watsky acted in concert in this incident and that the peer review proceeding was pretextual. Thus, the jury may have properly inferred an unlawful conspiracy.[12]
 
 
 24
 (3) Anti-Competitive Effect
 
 
 25
 That the hospital's actions had the effect of restraining trade is also supported by sufficient evidence. By causing Dr. Boczar's departure, Manatee effectively ended Dr. Boczar's ability to compete and to practice in Bradenton and burdened her ability to compete generally.
 
 
 26
 b. Conclusion
 
 
 27
 For the above reasons, we conclude that there was evidence from which the jury could reasonably infer that the hospital conspired with members of its medical staff and peer review committees, including un-named co-conspirators, to restrain trade in violation of the Sherman Act. It was error to grant the motion for JNOV.
 
 3. New Trial
 
 28
 Our review of dispositions of motions for a new trial is "rigorous if the motion is granted rather than denied ... and if the basis for the motion was ... the weight of the evidence." Watts, 842 F.2d at 310-311. In this case, "the trial involved simple issues and highly disputed facts, and ... lacked 'pernicious occurrences' such as prejudicial comments by counsel or introduction of possibly inflammatory evidence." Id. And our review of the record convinces us that the jury verdict was not against the "great weight" of the evidence. See id. Therefore, the conditional grant of a new trial was an abuse of discretion; and we must reverse the grant of a new trial and reinstate the verdict. Id.III. Conclusion
 
 
 29
 The orders of the district court granting judgment notwithstanding the verdict and conditionally granting the motion for a new trial are VACATED, and the case is REMANDED with instructions to reinstate the jury verdict and for further proceedings consistent with this opinion.
 
 
 30
 VACATED and REMANDED.
 
 
 
 [1]
 Dr. Boczar and two colleagues, Drs. Schroder and Elkington practiced obstetrics and gynecology for plaintiff-appellant Ob/Gyn Women's Care, Inc., formerly Obstetrics/Gynecology Women's Group, Inc., a Sarasota County firm. For simplicity, we will refer to these individuals and entities collectively as "Boczar" unless otherwise indicated
 
 
 [2]
 The two main incidents giving rise to peer review proceedings were these (which we label for convenience):
 (1) "Late Response Incident." Dr. DeRespino, an ER physician, charged that Boczar responded late to his call concerning a patient whom Dr. DeRespino mistakenly thought was suffering from a ruptured ectopic pregnancy. Boczar says that she correctly determined during DeRespino's call that she could complete the exams of two patients in her office before responding, 90 minutes later, to DeRespino's call and treating the ER patient. According to Boczar, DeRespino expressed no dissatisfaction at the time of the incident. R.Vol. 8 at 116-119.
 (2) "Abandonment Incident." An ER doctor charged that Boczar failed to respond to a call to see "her patient," Ms. Mossman, who had come to the emergency room. Boczar had not seen Mossman since delivering Mossman's child two years earlier. When called, Boczar determined that Mossman was not one of her current patients and informed the emergency room staff that Ms. Mossman should be seen by the on-call physician. Dr. Watsky, the emergency room supervisor started a peer review proceeding charging Boczar with abandoning a patient.
 
 
 [3]
 The named defendants included (1) Dr. Raitz, the chief of the medical staff at Manatee and chairman of its executive committee during 1988; (2) Dr. Inalsingh, vice-chairman of the executive committee during 1988; (3) Dr. Ganey, a general surgeon; and (4) Dr. DeRespino, an emergency room physician
 
 
 [4]
 Boczar conceded at oral argument that she does not contest the exoneration of the physician co-defendants. We note that, but for its finding that no sufficient evidence proved the existence of an un-named conspirator, the district court found nothing lacking in Boczar's evidence of the hospital's wrongful conduct. At the close of plaintiff's case, the district court denied appellee's motion for directed verdict as to the hospital. In ruling on the hospital's motion for JNOV, the district court found that "it is possible--and perhaps even reasonable--to infer from Dr. Watsky's conduct that he joined with the Hospital in a conspiracy to deny Dr. Boczar her economic rights," but concluded that Watsky's "demonstrated conduct is as consistent with permissible competition as with illegal conspiracy," and thus granted the motion. R.Vol. 5-153 at 15
 
 
 [5]
 Where a jury's verdict contains apparent inconsistencies, we must "make all reasonable efforts to reconcile an inconsistent jury verdict and 'if there is a view of the case which makes the jury's answers consistent, the court must adopt that view and enter judgment accordingly.' " Burger King Corp. v. Mason, 710 F.2d 1480, 1489 (11th Cir.1983)
 The jury verdicts returned in this case are not fatally "inconsistent" in ways that require this court to reach issues of the propriety of judgment n.o.v. on the ground of inconsistency or issues about preservation of "inconsistent verdict" questions for appeal. This case is not one where the jury, in holding the hospital liable and exonerating the individually-named physician defendants, returned a verdict that is on its face "legally and logically irreconcilable." Stancill v. McKenzie Tank Lines, Inc., 497 F.2d 529, 534 (5th Cir.1974). Nor is this a case where, assuming we were bound to assume that the named physicians did not conspire, we would deem the verdict inconsistent because "the record reveals no evidence upon which the jury could hold the hospital liable independent of the conduct of [the named doctors]." See Stivers v. George Washington University, 320 F.2d 751, 753-54 (D.C.Cir.1963). Instead, for the reasons later expressed in this opinion, this is a case where there are reasonable "view[s] of the evidence which make[ ] the jury's answers consistent," a view which we are bound to adopt. Burger King, 710 F.2d at 1489.
 In this case, as discussed below, there was evidence that the hospital conspired with some members of its staff other than the named defendants to restrain Dr. Boczar's practice. And the jury in this case was instructed that it was to decide whether the hospital conspired with "another named defendant or other person" and that it was "unnecessary for the plaintiffs to join as defendants all persons who may have participated with defendants in the alleged combination or conspiracy." R.Vol. 11 at 15-16. And, even if no un-named doctors conspired, the verdict might be reconciled: the verdict might mean simply that the jury found, in accord with its instructions, that named physician(s) did conspire with the hospital but did not proximately cause Dr. Boczar's injury or that all conspiring doctors were immune from liability. When the jury returned its verdicts, no one objected that the verdicts were inconsistent.
 
 
 [6]
 The Sherman Act provides that "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal...." 15 U.S.C. § 1 (1988)
 
 
 [7]
 Some non-ob/gyn physicians also had relationships affecting competition with ob/gyn specialists such as Dr. Boczar. For example, urologists and general surgeons performed some of the same surgical procedures as ob/gyn specialists, and general surgeons received referrals from ob/gyn specialists
 
 
 [8]
 The district court found that "the evidence at trial reasonably displayed that the Hospital did not treat Dr. Boczar fairly, perhaps because she was a successful competitor with its other OB-GYN physicians...." R.Vol 5-153 at 18
 
 
 [9]
 The record shows that Boczar documented 45 emergency room errors--unnecessary referrals or misdiagnoses of medical conditions--within a 10-day period in July. Kaleba passed these written comments on to the emergency room chief, Dr. Watsky. Mr. Kaleba testified that Dr. Boczar's "adversarial approach to resolution of problems ... obviously alienated a number of people, including physicians on the staff." R.Vol. 9 at 306
 
 
 [10]
 As this court has written earlier, negative peer review actions at a single hospital can ruin a doctor's professional reputation and career: "a negative decision by one hospital could be 'tantamount to excluding a doctor from the profession as a whole.' " Bolt, 891 F.2d at 820
 
 
 [11]
 R.Vol. 8 at 217
 
 
 [12]
 The charge that Boczar "abandoned" Mossman ultimately was found meritless by both the Florida Department of Professional Review and the hospital's hearing committee, which investigated the matter after Boczar's resignation
 Other evidence also tended to exclude the possibility that the hospital was engaged in legitimate peer review. There is significant doubt on this record, given the language of the hospital's by-laws, whether the hospital and its peer review committees innocently chose to proceed against Boczar under the summary suspension procedure. Under the hospital by-laws, certain senior physicians and the hospital administrator could summarily suspend a staff doctor who "engage[d] in or [was] likely to engage in any activity creating a substantial risk of injury to the health or safety of any patient, employee or other person present in the hospital as a result of what is or is likely to be improper conduct...." R.Vol. 8 at 105-06 (published to the jury). Dr. Boczar contends that this provision, which unlike other suspension provisions fails to provide the suspended doctor a right to a hearing, is normally invoked in immediate emergencies, such as to remove a doctor drunk on duty in the hospital. Dr. Boczar testified at trial that, at the time of her first summary suspension, she had no patients in the hospital and was out of state.
 There was evidence that, soon after the suspension issued in the late response incident and before investigation of the matter, a hospital employee directed some of Boczar's patients, including other hospital employees, to "pick up their records" and find another doctor because Boczar and her Sarasota colleagues were "in trouble" at Manatee. R.Vol. 8 at 119-20.
 And, the jury heard evidence that the executive committee chairman informed Dr. Boczar that, if she resigned, the investigation would cease and there would be no reporting to DPR. Boczar eventually did resign, but the hospital did report the suspensions to DPR on multiple occasions before its ultimate disposition of the charges against her.
 We believe that the jury could reasonably conclude that these and other inconsistencies and incidents of unfair treatment in the evidence, taken together, excluded the possibility that the hospital and its committees used the peer review procedure for purely legitimate ends.