Scott D. **LEVINE, M.D.,** Plaintiff,

v.

**CENTRAL FLORIDA MEDICAL AFFILIATES, INC., Healthchoice, Inc., Sand Lake Hospital and Orlando Regional Healthcare System, Inc. f/k/a Orlando Regional Medical Center, Defendants.**

No. 93–153–Civ–Orl–22.

United States District Court,
M.D. Florida,
Orlando Division.

Aug. 31, 1994.

Stephen D. Milbrath, Allen, Dyer, Doppelt, Franjola & Milbrath, Orlando, FL, John C. Butters, Law Office of John C. Butters, Atlanta, GA, for plaintiff.

Ronald Mark Schirtzer, Christopher K. Kay, Foley & Lardner, Orlando, FL, for Central Florida Medical Affiliates.

David Leonard Evans, Mateer, Harbert & Bates, P.A., Orlando, FL, for other defendants.

### ORDER

CONWAY, District Judge.

This cause comes before the Court for consideration of the motions for partial summary judgment filed by the Defendants in this case. In deciding the motions, the Court has considered all materials timely filed by the parties:

## I. Facts

Defendant Orlando Regional Healthcare Systems, Inc. ("ORHS"), which was formerly known as Orlando Regional Medical Center, is a not-for-profit organization that owns and operates Orlando Regional Medical Center (located in downtown Orlando) ("ORMC"), Arnold Palmer Hospital for Children and Women, and Defendant Sand Lake Hospital ("Sand Lake").

Healthnet Services, Inc. is a wholly owned for-profit subsidiary of ORHS. Healthnet owns Defendant Healthchoice, Inc. ("Health-choice"). Healthchoice is a preferred provider organization ("PPO") which presently has approximately 68,000 enrollees. Healthchoice competes with other PPOs, health maintenance organizations ("HMOs") and traditional comprehensive insurance coverage ("TCIC") companies to provide health care coverage in the Orlando area (Orange, Seminole and Osceola Counties), which presently has a population of approximately 1,139,000. Healthchoice enters into contracts with employers, insurers, and other payors to provide comprehensive health care coverage for employees, insureds and other beneficiaries.

Defendant Central Florida Medical Affiliates, Inc. ("CFMA") primarily acts as a physician advocacy group. Its members, who must be Healthchoice provider panel members, work with Healthchoice to attempt to ensure that the administrative practices of Healthchoice, including utilization reviews and reimbursement procedures, are acceptable to physician members of the provider panel. It is not, however, necessary to be a member of CFMA to be a participating physician on the Healthchoice provider panel, and numerous physician panel members of Healthchoice are not members of CFMA.

PPOs, such as Healthchoice, are comprised of a network of healthcare providers, including physicians and hospitals. Some PPOs, including Healthchoice, use a limited or closed panel of providers. Healthchoice determines the size of its provider panel under a need analysis system. Utilizing recognized industry standards, the number of physicians on the panel are determined by a number of factors, including: 1) the number of enrollees in the plan; 2) the geographic location of enrollees and physician panel members; 3) the specialty areas in which the physician panel members practice; 4) the administrative cost of operating the plan; and 5) special needs of particular payors. Healthchoice asserts that it strives to have the right number of qualified physicians on its closed panel to meet the needs of enrollees, while providing panel members with a sufficient patient base to induce them to provide services for lower fees.

Plaintiff is a physician, specializing in internal medicine. He graduated from Wayne State University with an M.D. degree in 1985. He did an internship and a residency in internal medicine at the UCLA/San Fernando Valley Program. He moved to Orlando, Florida in the fall of 1989. On September 25, 1989, he was granted provisional staff privileges at both ORMC and Sand Lake. On November 12, 1990, he was granted active staff privileges at both hospitals.

In November 1990, Plaintiff inquired into the possibility of joining CFMA and Health*choice*. He was informed that there were already enough internists in his quadrant of the city to meet Health*choice* member needs. Plaintiff then hired an attorney to inquire about admission to CFMA and Health*choice*.

On January 11, 1991, Plaintiff's emergency room privileges at Sand Lake were suspended. Shortly thereafter, his other medical staff privileges were suspended.[1] Those privileges were reinstated, subject to certain conditions, in May 1991.

Plaintiff has brought this suit asserting federal antitrust claims and pendant state claims.

## II. Count III: Concerted Refusal to Deal

Plaintiff asserts that Sand Lake, ORMC and another internist conspired to blacklist Plaintiff by summarily suspending his staff and emergency room privileges and circulating to other doctors the notice of his suspension. This conspiracy allegedly violates Section 1 of the Sherman Act, 15 U.S.C. § 1. That section provides, in relevant part, that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." Sand Lake and ORHS have filed a Motion for Partial Summary Judgment (Dkt. 58) in which they argue that Plaintiff lacks standing and, alternately, that Plaintiff cannot establish a conspiracy in restraint of trade.

### a. Standing

The Eleventh Circuit has identified a two-pronged approach to determine whether a plaintiff has antitrust standing. To be a proper party, a plaintiff must have suffered an antitrust injury and must be an efficient enforcer of the antitrust laws. *Thompson v. Metropolitan Multi–List, Inc.,* 934 F.2d 1566, 1571 (11th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 295, 121 L.Ed.2d 219 (1992); *Todorov v. DCH Healthcare Authority,* 921 F.2d 1438, 1449 (11th Cir.1991).

Antitrust injury is defined as:

injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations ... would be likely to cause.'

*Todorov,* 921 F.2d at 1449 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)). The plaintiff must show that his injury coincides with " 'the public detriment tending to result from the alleged violation ... increas[ing] the likelihood that public and private enforcement of the antitrust laws will further the same goal of increased competition.' " *Todorov,* 921 F.2d at 1450 (quoting *Austin v. Blue Cross & Blue Shield,* 903 F.2d 1385, 1389–90 (11th Cir.1990)).

In addition to establishing an antitrust injury, a plaintiff must be an efficient enforcer of the antitrust laws. To determine whether a party is an efficient enforcer, a court must consider a variety of factors set forth by the Supreme Court in *Associated General Contractors, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). *Todorov,* 921 F.2d at 1450–52.

---

1. Plaintiff, in his Complaint, clearly alleges that his privileges were suspended at both ORMC and Sand Lake. However, documents filed recently by the parties suggest that Plaintiff was only suspended at Sand Lake. The Court's analysis is the same, whether Plaintiff's privileges were suspended at both hospitals or only one. The Court assumes, for the purpose of deciding the pending motions, that Plaintiff's privileges were suspended at both ORMC and Sand Lake.

Defendants assert that, even if Plaintiff can establish a personal injury, he cannot establish an antitrust injury. They note that Plaintiff was suspended for a period of about five months. During this period of time, Plaintiff had staff privileges at Florida Hospital's several campuses, Charter Hospital and Glenbeigh. Through these other hospitals, Plaintiff had access to 1,623 licensed beds. Immediately after his suspension, Plaintiff began using Florida Hospital for the hospitalization of his patients. Therefore, there was a change in the location at which some patients received services, but there was no decrease in services available to consumers of medical services. There was no decrease in the number of internists practicing in the Orlando area. There is no indication that Plaintiff's suspension had any effect on the price of services rendered. Defendants argue, therefore, that Plaintiff cannot establish an antitrust injury.

In response, Plaintiff identifies the injuries that he has suffered. Plaintiff states that his suspension was a black mark on his career, which resulted in Plaintiff being blacklisted and precluded from working with doctors, the emergency room and patients.[2] Plaintiff's suspension was reported to Florida's Department of Professional Regulation. The suspension resulted in a stigma and difficulty regarding privileges at other hospitals.[3] Finally, Plaintiff suggests that he has lost income from his suspension. Plaintiff argues that under applicable caselaw, these injuries are sufficient to satisfy standing requirements.

The first case on which Plaintiff relies is *Bolt v. Halifax Hospital Medical Center*, 891 F.2d 810 (11th Cir.1990), *cert. denied*, 495 U.S. 924, 110 S.Ct. 1960, 109 L.Ed.2d 322 (1990). In *Bolt*, the court held that "a hospital and the members of its medical staff are all legally capable of conspiring with one another." *Id.* at 819. The next question

before the court was whether at trial on the merits, plaintiff established that the defendants actually did conspire. The court did not specifically address whether the plaintiff had suffered an antitrust injury and therefore had standing to sue. Plaintiff suggests that the standing requirement was clearly satisfied in *Bolt* since the court did not find it necessary to address that issue. In interpreting and applying caselaw, there is a certain danger inherent in assuming that an issue not presented to and addressed by the court has been decided. Nonetheless, the Court will make this assumption in order to assess the argument made by Plaintiff. Assuming that the plaintiff in *Bolt* did have standing to bring an antitrust claim, the Court must identify the nature of the injury suffered which constituted an "antitrust injury."

The plaintiff in *Bolt* was a physician who was denied reappointment and suspended by three different executive committees at three different hospitals in Daytona Beach, Florida. In discussing whether the Defendants actually did conspire, the court stated that doctors in a hospital may be motivated to exclude other doctors. The exclusion allows the doctors who remain to charge higher prices. *Id.* at 820. The court went on to observe:

> [A] negative decision at one hospital could affect the decision at another hospital; therefore ... a negative decision by one hospital could be 'tantamount to excluding a doctor from the profession as a whole.' Given the ability of a single peer review committee to control the supply of doctors not only at one hospital but also in the profession as a whole, we conclude that there existed a rational economic motive for the DCH defendants to conspire to deny Dr. Bolt's hospital privileges.

*Id.* (citation omitted). This analysis, which suggests an economic motive for conspiracy,

---

**2.** Since Plaintiff had staff privileges and was able to admit patients at other hospitals, the Court assumes that Plaintiff's injury was his inability to work with doctors, the emergency room and patients at Sand Lake and ORMC.

**3.** To support his assertion that the Florida Department of Professional Regulation was notified and that he subsequently had difficulty regarding

privileges at other hospitals, Plaintiff cites certain documents by referring to their Bates numbers. After a diligent review of all documents submitted by the parties, the Court has been unable to locate these documents. For the purpose of deciding the pending motions, the Court assumes that Plaintiff's assertions are true.

also suggests the type of antitrust injury that may result from a conspiracy. In fact, the plaintiff in *Bolt* did find himself unable to practice at three different hospitals. It appears that the Plaintiff was effectively removed from competition and the total number of doctors available to render service was reduced. However, this type of information was never fully developed since the trial court had considered only the issue of conspiracy. *Id.* at 828.

While *Bolt* suggests the type of antitrust injury that may result from a conspiracy in restraint of trade, the facts of the case before the Court do not support the existence of such an injury. During the time his privileges were suspended at Sand Lake and ORMC, Plaintiff was able to admit patients to several other hospitals. An antitrust injury could have been the result of Plaintiff's suspension. But that possibility does not automatically lead to a conclusion that an antitrust injury did result.

Plaintiff also relies on *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991). In *Pinhas* the Supreme Court addressed the very limited question of whether the interstate commerce requirement of antitrust jurisdiction is satisfied by allegations that a hospital, its staff and others conspired to exclude a physician from the market for his specialized medical services. The Supreme Court held that the interstate commerce jurisdictional requirement was satisfied, based on the allegations in the complaint. The Court did not directly address the type of antitrust injury that would satisfy a standing requirement. However, Justice Scalia, writing for the dissent, observed that the defendant hospital had "effectively excluded [the doctor] from the entire Los Angeles market for eye surgery (because no other Los Angeles hospital would accord him practice privileges after [the defendant hospital] rejected him)." *Id.* at 336, 111 S.Ct. at 1850. Once again, the situation for Plaintiff in the case at bar is very different from the situation described in *Pinhas.*

Finally, Plaintiff refers the Court to *Boczar v. Manatee Hospitals & Health Systems,* *Inc.,* 993 F.2d 1514 (11th Cir.1993). In *Boczar* the Eleventh Circuit reviewed the record from the trial court to determine whether the evidence supported the existence of a conspiracy. Once again the Eleventh Circuit did not directly address the issue of antitrust injury and the case provides only limited guidance on this critical issue. In *Boczar,* the doctor's staff privileges were suspended at only one hospital. On the surface it would appear that action by one hospital is sufficient to establish antitrust injury. However, the court noted that the hospital "effectively ended [the doctor's] ability to compete and to practice in Bradenton and burdened her ability to compete generally." *Id.* at 1519.

Plaintiff in the case before the Court cannot make such a claim. He has successfully competed and practiced in the Orlando area. Whatever may be said about his personal injuries, his suspension from ORMC and Sand Lake does not constitute an antitrust injury. Therefore, he lacks standing to bring a claim under Section 1 of the Sherman Act.

### b. Conspiracy in Restraint of Trade

Even if the Court were to assume that Plaintiff has standing to bring a Section 1 claim, Defendants would prevail on their motion for summary judgment. "The elements of a conspiracy to restrain trade under Section 1 are (1) an agreement to enter a conspiracy (2) designed to achieve an unlawful objective. The plaintiff must also prove (3) 'actual unlawful effects [or] facts which radiate a potential for future harm' to competition." *U.S. Anchor Mfg., Inc. v. Rule Industries, Inc.,* 7 F.3d 986, 1001 (11th Cir. 1993) (citations omitted), *cert. denied,* — U.S. —, 114 S.Ct. 2710, 129 L.Ed.2d 837 (1994). *See also Bolt v. Halifax Hospital Medical Center,* 891 F.2d 810, 820 (11th Cir. 1990) (requiring a plaintiff to prove 1) an intent to adhere to an agreement; 2) which was not designed to achieve a legitimate business purpose; and 3) which had an anticompetitive effect).

As stated above, the Eleventh Circuit has held that a hospital and the members of its medical staff are all legally capable of con-

spiring with one another.[4] *Bolt,* 891 F.2d at 819. A hospital and its staff may have economic reasons to conspire to suspend staff privileges for a doctor. *Id.* at 820; *Boczar v. Manatee Hospitals & Health Systems, Inc.,* 993 F.2d 1514, 1518 & n. 10 (11th Cir.1993). Evidence of inconsistencies in the review process and of unfair treatment may exclude the possibility that the hospital and its staff pursued the review for purely legitimate ends. *Boczar,* 993 F.2d at 1519 n. 12. Therefore, a doctor may establish the first two elements of a Section 1 claim by attacking the peer review process and by presenting evidence that suggests the review was a sham and pretextual. For the purpose of deciding Defendants' motion, the Court will assume that Plaintiff can establish the first two elements of a Section 1 claim.[5] The task before the Court is to determine whether the actions of ORMC and Sand Lake have resulted in an anticompetitive effect.[6]

■ Defendants have argued that evidence of an anticompetitive effect or, alternately, evidence of a potential to harm future competition, generally require a plaintiff to show that the defendant(s) had market power in the relevant product and geographic markets. In support of their argument, Defendants refer the Court to *Lie v. St. Joseph Hospital,* 964 F.2d 567 (6th Cir.1992). In *Lie* the Sixth Circuit summarized Supreme Court caselaw that provides a structure for analyzing whether an agreement unreasonably restrains trade. If an agreement is plainly anti-competitive, it is considered a *"per se"* antitrust violation. *Id.* at 569. If an agreement is illegal *per se,* the plaintiff does not have to establish proof of defendants' market power. *Id.* However, there are very few classes of conduct that are illegal *per se. Capital Imaging Associates v.*

*Mohawk Valley Medical Associates, Inc.,* 996 F.2d 537, 542 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993). Examples of *per se* violations include horizontal and vertical price-fixing, division of a market into territories, certain tying arrangements, and some group boycotts involving concerted refusal to deal with a competitor. *Id.* at 542–43. As the Second Circuit noted in *Capital Imaging,* "[i]n discussing group boycotts the Supreme Court cautions against application of the *per se* rule against professional associations because the economic impact of professional activities is so difficult to track." *Id.* at 543 (citing *FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 458–59, 106 S.Ct. 2009, 2017–18, 90 L.Ed.2d 445, 457 (1986)).

■ Most antitrust violations do not fall within the limited categories of *per se* violations. Instead, a plaintiff must prove the existence of an antitrust injury under a "rule of reason" analysis. *Id.* The purpose of the rule of reason analysis is to determine whether a restraint regulates and promotes competition or whether it suppresses competition. *Lie,* 964 F.2d at 569. This determination usually requires an inquiry into market definition and market power. *Id.*

There is one exception to the usual requirement that a plaintiff establish market power as part of the rule of reason analysis. If the antitrust violation involves " 'a naked restriction on price or output' " or, similarly, if a plaintiff can provide " 'proof of actual detrimental effects,' " failure to prove market power will not defeat a plaintiff's claim. *Id.* at 569–70 (quoting *Indiana Fed'n of Dentists,* 476 U.S. at 460–61, 106 S.Ct. at 2018–19).

---

4. Plaintiff appears to misunderstand the holding in *Bolt.* A holding that a hospital and its staff have the legal capacity to conspire does *not* mean that every action taken by the hospital and its staff will satisfy the conspiracy requirements. A plaintiff must still prove that the members actually did conspire. *Bolt,* 891 F.2d at 819.

5. The Court's review of the first two elements has been significantly hindered by Plaintiff's failure to provide at least a page cite to a number of depositions filed in support of his response. As a

practical matter, the Court simply does not have the time to track down statements that purportedly create a disputed issue of fact. Faced with this dilemma, the Court has chosen to assume the first two elements are satisfied.

6. Requiring a plaintiff to establish the existence of an anticompetitive effect in order to prevail on the merits is similar to requiring a plaintiff to show an antitrust injury in order to establish standing.

Plaintiff has suggested that this case involves a group boycott, which traditionally has been categorized as a *per se* violation. The Court is not persuaded that the facts presented are consistent with the traditional group boycott situation. Upon review of relevant caselaw, the Court concludes that the proper analysis in this case is the rule of reason. *Indiana Fed'n of Dentists*, 476 U.S. at 458–59, 106 S.Ct. at 2017–18. The next question is whether this case is an exceptional one in which actual detrimental effects on competition have been established so that the Plaintiff is not required to establish market power. As set forth above, Plaintiff has not established that his suspension had any effect whatsoever on competition. Therefore, he is not relieved of his obligation to establish market power. As Defendants note, Plaintiff has not attempted to define the relevant market or provide evidence of market power. He has, therefore, failed to present evidence critical to his claim.

Plaintiff has argued that caselaw establishes that he has suffered an antitrust injury as a matter of law. The Court cannot agree. In *Summit Health, Ltd. v. Pinhas*, the Supreme Court addressed a threshold issue related to jurisdiction. 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991). The Supreme Court never reached the elements of a Section 1 claim. Similarly, in *Bolt v. Halifax Hospital Medical Center*, the Eleventh Circuit never addressed the issue of whether the defendants' actions actually restrained competition. 891 F.2d 810, 829 (11th Cir.1990). By contrast, in *Boczar v. Manatee Hospitals & Health Systems, Inc.*, the Eleventh Circuit did address the issue of whether the plaintiff had established an anticompetitive effect. 993 F.2d 1514 (11th Cir. 1993). The court stated that the hospital "effectively ended [the doctor's] ability to compete and to practice in Bradenton." *Id.* at 1519. It appears that the plaintiff in that case established the existence of an actual detrimental effect on competition. Once again, when a plaintiff has made such a showing, a failure to establish market power is not fatal to plaintiff's case. The Plaintiff, in his case, has made no such showing. After his suspension, he went on to compete effectively in Orlando. Unlike the plaintiff in *Boczar*, Plaintiff must establish market power in order to maintain a claim under Section 1. This he has not done. Therefore, his claim must fail.

Under the facts of this case, Plaintiff has failed to establish an antitrust injury, and, therefore, he lacks standing to bring his claim. Alternately, he has failed to establish an anti-competitive effect, and, therefore, his claim must fail on the merits. Defendants are entitled to summary judgment on the federal antitrust claims in Count III of Plaintiff's Complaint.

### III. Count I: Conspiracy to Unreasonably Reduce The Availability of and Competition in Services to Consumers of Medical Services and Count II: Monopolization, Attempt to Monopolize, Conspiracy to Monopolize.

The parties agree that Plaintiff has expressed an interest in becoming a member of CFMA and a provider of services for Health*choice*. CFMA and Health*choice* have indicated there is no need for Plaintiff's services. Based on these events, Plaintiff asserts that CFMA, Health*choice*, ORMC and Sand Lake have monopolized, attempted to monopolize and conspired to monopolize the provision of medical services by physicians and hospitals to patient members of Health*choice* (product market), in the Orlando, Florida area (geographic market) in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.[7] Additionally, Plaintiff asserts that CFMA, Health*choice* and the member doctors of CFMA have conspired to unreasonably restrict the availability of and competition among healthcare providers for the consumers of Health*choice* in violation of Section 1 of the Sher-

---

7. Section 2 of the Sherman Act provides:
   Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court. 15 U.S.C. § 2.

man Act, 15 U.S.C. § 1.[8] According to Plaintiff, "[e]mployees whose employers have contracted with Health*choice* practically will not and do not purchase medical services from physicians who are not members of CFMA," and "CFMA doctors provide virtually 100% of all medical services to consumers of Health*choice*." Complaint (Dkt. 1), paras. 19, 34. CFMA and Health*choice* have filed separate Motion[s] for Partial Summary Judgment (Dkts. 47 and 61, respectively) in which they argue that Plaintiff lacks standing to bring these claims and, alternately, that Plaintiff cannot establish the elements required for either a Section 1 or a Section 2 claim.

### a. Standing

As set forth in Section II.a., the Eleventh Circuit has identified a two-pronged approach to determine whether a plaintiff has antitrust standing. A plaintiff 1) must have suffered an antitrust injury and 2) must be an efficient enforcer of the antitrust laws. *Todorov v. DCH Healthcare Authority*, 921 F.2d 1438, 1449 (11th Cir.1991).

■ The inquiry into whether a plaintiff is an efficient enforcer of the antitrust laws requires a court to consider several different factors. *Id.* at 1451. One factor is the "directness of the asserted injury in a causal sense." *Id.* If there is " 'an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement,' ", a party with an indirect injury may not be the proper party to enforce the antitrust laws. *Id.* (quoting *Associated Gen. Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 542, 103 S.Ct. 897, 910, 74 L.Ed.2d 723 (1983)). A second factor is the nature of the plaintiff's damages claims. *Id.* If the claims are highly speculative, the plaintiff may not have standing. Finally, a court should review a plaintiff's claim in light of the overarching goal of keeping antitrust litigation within " 'judicially manageable limits.' ". *Id.* (quoting *Associated Gen.*, 459 U.S. at 543, 103 S.Ct. at 911). With this goal in mind, a court should avoid "duplicative recoveries and the danger of complex apportion-

ment of damages." *Id.* Upon review of these factors, a court may determine whether "a particular plaintiff will efficiently vindicate the goals of the antitrust laws." *Id.* at 1452.

In *Todorov*, the plaintiff, a neurologist, applied for the privilege of administering and interpreting CT scans of the head. *Id.* at 1441–43. At the time the plaintiff applied for this privilege, CT scans were administered by the defendant hospital's radiology department. After a CT scan was administered, a radiologist would interpret the film for the patient's treating physician. In connection with his practice, the plaintiff usually examined the film for his patients after the interpretation by the radiologist. However, the plaintiff had difficulty collecting a fee for his examination from insurance companies because most companies would pay only one fee. That fee went to the radiologist who made the official interpretation. The plaintiff sought the privilege of administering CT scans in order to claim the fee for interpretation of the film. The hospital denied his application.

After elaborating on the two-pronged test for standing, the court in *Todorov* conducted an economic analysis of the market for administering CT scans. *Id.* at 1452–54. The plaintiff had alleged that the radiologists were reaping monopoly profits. The court noted that the plaintiff had applied for privileges so that he could share in those same profits. *Id.* In effect, the plaintiff was trying to use the antitrust laws as a means to gain benefits based on anticompetitive conduct. The court concluded that "[t]his is not antitrust injury. The antitrust laws were not enacted to permit one person to profit from the anticompetitive behavior of another person." *Id.* at 1454.

■ In the case at hand, the Court assumes, solely for the purpose of deciding the motions for summary judgment, that the closed panel PPO that Health*choice* operates is an illegal restriction that violates the antitrust laws. Given that assumption, it appears to the Court that Plaintiff's primary goal is to share in the "illegal profits" that CFMA members enjoy. In one of his deposi-

---

8. For the text of Section 1 of the Sherman Act, see Section II.

tions, Plaintiff was asked how much money he thought he would have made if he had been a member of CFMA. Plaintiff responded, "I haven't sat down with a pencil and paper and tried to figure it out. But I figured, with what everyone else is telling me, I could have done 20 percent better." Levine Deposition, 12/6/93, p. 468. Plaintiff's expectation is rooted in an assumption that his application would be accepted, and that he would serve on an equal footing with all other doctors on the closed panel. Only in this manner could Plaintiff reasonably expect to increase his income by 20 percent. Plaintiff's situation is identical to the plaintiff's situation in *Todorov*. He hopes to benefit from the Defendant's allegedly anticompetitive conduct. This Court must echo the Eleventh Circuit in concluding that "[t]his is not antitrust injury. The antitrust laws were not enacted to permit one person to profit from the anticompetitive behavior of another person." *Id.*

Counsel for Plaintiff vehemently denies that Plaintiff seeks to keep Health*choice* a closed panel. Brief in Opposition to Motions for Partial Summary Judgment (Dkt. 91), p. 16. In his affidavit, Plaintiff states, "I did not and do not feel that Healthchoice and CFMA should be closed to any qualified license[d] doctors. It is and has been my view that Healthchoice and CFMA should be open to all licensed physicians, so as to give consumers in Healthchoice unrestricted choice in medical care providers." Affidavit of Scott D. Levine, M.D. (Dkt. 112), para. 13. *See also* Complaint (Dkt. 1), para. 26. It is not within the province of the Court to determine the credibility of testimony when evaluating the merits of a motion for summary judgment and the response thereto. Accordingly, for the purpose of deciding the pending motions, the Court will accept at face value Plaintiff's argument that the remedy he seeks is an open panel and analyze whether Plaintiff is the proper party to bring such a claim.

The difficulty with Plaintiff's argument is that, even if Health*choice* were open to all doctors, there is no way to calculate the effect on Plaintiff's practice. Plaintiff states that the success of his business is due to the excellent care he renders and the attention to the patient he provides for a fair price. *Id.* He states:

My success in general by using this approach would have carried over to me being very successful in caring for Healthchoice patients. If my income far exceeds that of other internists in Orlando, it is because I provide excellent care for a fair price. Those same factors would likely cause me to far exceed the income of other internists in caring for Healthcare patients if Healthchoice and CFMA were open to me and other providers of medical care.

*Id.* For the sake of deciding the pending motions, the Court assumes Plaintiff would be more successful, financially speaking, than all other internists if Health*choice* were an open panel PPO. The question before the Court is whether the increase in his practice could be quantified.

There are currently 2,200 licensed physicians in the Orlando area. Health*choice* presently has 863 physicians on its provider panel in Orange, Seminole and Osceola Counties. It is impossible to predict how many of the doctors not currently on the panel would choose to participate in Health*choice*. The Defendants have argued that, at this time, doctors are willing to accept a lower price for services rendered to Health*choice* patients because the closed panel ensures that doctors will have a relatively high volume of patients. If Health*choice* is an open panel, doctors may be disinclined to join the PPO. For example, Plaintiff has not joined a variety of HMOs and PPOs because he does not see an economic advantage to belonging to those managed care plans. Even if all 1,337 of the doctors not currently participating in Health*choice* were to apply to join the panel, it is impossible to predict how many of those doctors would qualify and be accepted. And finally, it is impossible to estimate the effect on Plaintiff's practice. There is no way to know how many patients would choose Plaintiff as their internist or what services those patients would require. There is also no way to calculate the effect of adding new patients to Plaintiff's existing practice. Given the sheer number of patients he sees and the hours he works, it is not reasonable to as-

sume that Plaintiff could absorb an unlimited number of new patients. Some displacement would inevitably take place. It appears that any damages Plaintiff may be able to claim are highly speculative. Therefore, Plaintiff is not an efficient enforcer of this alleged antitrust violation.

If, as his deposition testimony suggests, Plaintiff has brought this suit in order to force Defendants to accept him as a member of the Health*choice* closed panel PPO, he lacks standing because he cannot claim he has suffered an antitrust injury. He merely hopes to profit from the allegedly anticompetitive conduct of others. If, as his affidavit testimony suggests, Plaintiff has brought this suit to force Health*choice* into operating as an open panel PPO, he lacks standing because he is not an efficient enforcer. Any damage that he might claim is entirely speculative. Since Plaintiff lacks standing, Defendants are entitled to summary judgment on the Sherman Act claims in Count I and Count II of Plaintiff's Complaint.

**b. Market Definition and Market Power**

Defendants have argued that Plaintiff cannot establish the elements of their claims. In part, the Defendants assert that Plaintiff is required to define the market and prove market power. Plaintiff asserts that the antitrust violation alleged is *per se* illegal. As set forth in Section II.b., a party need not prove market power if the antitrust violation is one of a limited group deemed to be illegal *per se*. In other cases, the plaintiff must establish market power as part of the rule of reason analysis.

Having reviewed the arguments and caselaw advanced by the parties, the Court finds the following guidance from the Supreme Court to be most instructive:

> As we observed last Term ..., the category of restraints classed as group boycotts is not to be expanded indiscriminately, and the per se approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor—a situation obviously not present here. Moreover, we have been slow to condemn rules adopted by professional associations as unreason-

able per se, and, in general, to extend per se analysis to restraints imposed in the context of **business relationships where the economic impact of certain practices is not immediately obvious.**

*FTC v. Indiana Fed'n of Dentists,* 476 U.S. 447, 458–59, 106 S.Ct. 2009, 2017–18, (citations omitted) (emphasis added). Plaintiff has argued that CFMA and Health*choice* have fixed prices and that prices to consumers have increased. The data provided by Plaintiff suggests that costs for services for Health*choice* patients have gone up from 1990 to 1992. Brief in Opposition to Motions for Partial Summary Judgment (Dkt. 91), pp. 7–8. However, Plaintiff has provided no context for the data he recites. It is not clear whether these numbers indicate that costs for services for Health*choice* patients have gone up more dramatically then other medical costs. Defendant has argued that HMOs and PPOs are well recognized programs for reducing medical costs. Plaintiff provides a recent article by two professors from the University of Connecticut suggesting that, over time, the price for HMOs may rise. Plaintiff's Appendix, Exhibit 15. This same article, however, recognizes that the growth of HMOs has, up to this point in time, been viewed as a procompetitive change in the health industry.

In this suit, Plaintiff suggests that a closed panel PPO has an anticompetitive effect. This anticompetitive effect is far from obvious. If it were obvious, purchasers of health plans would avoid managed care benefit plans. Instead, statistics indicate purchasers are buying more managed care plans. Since the competitive effect is not immediately obvious, the Court would be unwilling to apply a *per se* approach in this case.

Plaintiff must, therefore, define the market and establish market power. Plaintiff has asserted that the relevant geographic market is the Orlando, Florida area and the relevant product market is the provision of medical services by physicians and hospitals to patient members of Health*choice*. Complaint, para. 33. The Court feels compelled to note that Plaintiff's definition of product market is

most peculiar. He has limited the product market to a service rendered solely by Defendants. If a plaintiff were permitted to use such an approach, it would in effect eliminate the requirement of establishing market power. Each and every defendant would have monopoly power in the sale of a distinctive product or service. A more reasonable product market would be the market for medical services in general or the market for medical services of an internist.

However, these observations are not essential to disposition of the pending motions. Since Plaintiff lacks standing to bring this federal antitrust claim, Defendants are entitled to summary judgment.

### IV. Plaintiff's State Claims

In addition to Plaintiff's federal antitrust claims, Plaintiff has alleged violations of Florida's antitrust provisions. Specifically, Counts I and III assert a violation of Fla. Stat. § 542.18, and Count II asserts a violation of Fla.Stat. § 542.19. Section 542.20, Fla.Stat. provides:

Any activity or conduct exempt under Florida statutory or common law or exempt from the provisions of the antitrust laws of the United States is exempt from the provisions of this chapter.

Since the Court has concluded that Defendants are entitled to summary judgment on Plaintiff's federal antitrust claims, Defendants are similarly entitled to summary judgment on Plaintiff's state antitrust claims. *Auton v. Dade City,* 783 F.2d 1009, 1010 n. 1 (11th Cir.1986).

In Counts IV, V and VI, Plaintiff asserts various state law claims. Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over these claims.[9]

The Court recognizes that this case is being dismissed on the eve of trial and regrets that the parties have had to prepare for trial. To a certain extent, the parties accept the risk of a delay in ruling when they stipulate to extend the deadline for filing dispositive motions. However, the delay in ruling on the pending motions was also due to Plain-

tiff's counsel's failure to cite to specific portions of the record. *See, e.g.,* n. 3, 5 *supra.*

Accordingly, it is hereby ORDERED:

1. The Motion for Partial Summary Judgment by Defendant Central Florida Medical Affiliates, Inc. (Dkt. 46) is GRANTED.

2. The Motion for Summary Judgment by Defendants Orlando Regional Healthcare Systems, Inc. f/k/a Orlando Regional Medical Center and Sand Lake Hospital (Dkt. 58) is GRANTED.

3. The Motion for Partial Summary Judgment by Defendant Health*choice,* Inc. (Dkt. 60) is GRANTED.

4. Plaintiff's Motion to Strike the Supplemental Affidavit of Roger D. Blair (Dkt. 141) is DENIED.

5. Counts IV, V and VI of Plaintiff's Complaint are DISMISSED without prejudice.

6. The Clerk of the Court shall enter judgment against Plaintiff and in favor of Defendants on Counts I, II and III of Plaintiff's Complaint.

DONE AND ORDERED.

---

9. The Court notes that Plaintiff's state court case, Case No. 93–1476, Ninth Judicial Circuit, Orange County, Florida, was stayed on April 21, 1993 and is still pending.